Nos. 16-1903, -1904, -1905

# United States Court of Appeals for the Federal Circuit

**FO2GO LLC,**
*Plaintiff-Appellant,*

v.

**PINTEREST, INC., SMUGMUG, INC., TUMBLR, INC., YAHOO! INC.,**
*Defendants-Appellees*

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:15-cv-00097-RGA, 1:15-cv-00099-RGA, and 1:15-cv-00101-RGA, Judge Richard G. Andrews.

## BRIEF OF PLAINTIFF-APPELLANT FO2GO LLC

David R. Bennett
*Counsel of Record*
DIRECTION IP LAW
P.O. Box 14184
Chicago, IL 60614
Telephone: 312-291-1667
dbennett@directionip.com

*Attorney for Plaintiff-Appellant*

June 20, 2016

## **U.S. PATENT NO. 7,173,651 – CLAIM 2**

2. Digital photo processing system comprising:

at least one wireless digital camera apparatus, wherein each said apparatus includes a processor, a memory, and a destination address and one or more previously defined recipient codes stored in said memory; user interface connected to said processor for at least displaying one or more said recipient codes and receiving signals indicating user selection of a displayed recipient code; a digital camera connected to said processor for capturing one or more digital images in response to signals from said user interface; a RF communications device connected to said processor; and processor control means, responsive to signals received from said user interface, for transmitting a message, including at least said selected recipient code and one said digital image, to said destination address via said RF communications device; and

a server associated with said destination address and responsive to messages received at said destination address from each said wireless digital camera apparatus; a database storing account configuration data including recipient code data; a server communication device; and server control means for parsing said recipient code from each said message, retrieving from said database account configuration data that is associated with said recipient code, and processing each said message according to said account configuration data.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

FO2GO LLC v. Pinterest, Inc.

Case No. 16-1903, 16-1904, 16-1905

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

FO2GO LLC

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| FO2GO LLC | Same as 1. | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Direction IP Law: David R. Bennett; Bayard, P.A.: Stephen Brauerman, Sara Bussiere, Richard Kirk, Vanessa Tiradentes

Jun 20, 2016
Date

/s/David R. Bennett
Signature of counsel

Please Note: All questions must be answered

David R. Bennett
Printed name of counsel

cc: 

Reset Fields

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... v

TABLE OF ABBREVIATIONS .......... vii

STATEMENT CONCERNING ORAL ARGUMENT .......... viii

STATEMENT OF RELATED CASES .......... ix

I. JURISDICTIONAL STATEMENT .......... 1

II. STATEMENT OF THE ISSUES .......... 2

III. STATEMENT OF THE CASE .......... 3

A. Background of the Invention in the ‘651 Patent .......... 4

B. Claims of the ‘651 Patent .......... 6

1. Claim 2 Requires a Wireless Digital Camera Apparatus Having a Processor Control that can Send a Message Containing a Recipient Code to a Server at a Destination Address and the Server Control Parses the Recipient Code from the Message for Processing .......... 6

2. The Specification Discloses the Format, Structure, and Creation of the Message Containing a Recipient Code Sent by the Digital Camera Apparatus and Parsing the Message by the Server Control .......... 8

C. The District Court Held an Early Claim Construction Hearing on One Term: “Server Control Means for Parsing Said Recipient Code from Each Said Message” .......... 11

1. Defendants Contended that the Term “Server Control Means for Parsing Said Recipient Code from Each Said Message” was in Means-Plus-Function Form and was Indefinite .......... 12

2. FO2GO Demonstrated that the "Server Control" Term is Not in Means-Plus-Function Form and, Regardless, that the Specification Discloses a Sufficient Structure to a Person Skilled in the Art for Parsing by the Server ........................................................13

a) FO2GO Submitted the Unrebutted Barnett Declaration Demonstrating that the Claims Provided Sufficient Structure for Parsing the Recipient Code from the Message and that the Specification Also Disclosed a Sufficient Structure for Parsing ....................................................13

b) A Person Skilled in the Art Does Not Have to Devise a Means to Carry Out Parsing Because the Claims Disclose a Sufficient Structure for the Straightforward Software Operation of "Parsing" ................................................16

c) Embodiments in the Specification Disclose Sufficient Structures and Algorithms for Parsing the Recipient Code from a Message ..................19

D. The District Court Incorrectly Held that the Claim Term is in Means-Plus-Function Form and is Indefinite .............................22

1. The District Court Incorrectly Analyzed Whether the Claim Term is in Means-Plus-Function Form ....................22

2. The District Court Incorrectly Held that the Specification Did Not Provide Sufficient Structure Resulting in the District Court Holding that the Claims Are Indefinite ..............................................................23

IV. SUMMARY OF THE ARGUMENT ..........................................................26

V. ARGUMENT .........................................................................................29

A. Standards of Review .......................................................................29

B. The "Server Control" Term is Not in Means-Plus Function Form ....................30

1. Statement of the Law on the Means-Plus-Function Analysis ....................30

a) A Term is Not in Means-Plus-Function Form if the Words Are Understood by Persons of Ordinary Skill to Have a Sufficiently Definite Meaning as to the Name for Structure ....................31

b) A Sufficient Structure is Disclosed if One Skilled in the Art Would Have Understood that the Disclosure Encompasses Server Software for the Claimed Function and the Disclosure is Sufficient to a Skilled Artisan to Implement Such a Program ....................32

2. The Claims Provide a Sufficiently Definite Structure for "Server Control Means for Parsing Said Recipient Code from Each Said Message" Such that the Term is Not in Means-Plus-Function Form ....................33

a) A Person Skilled in the Art Does Not Need to Devise a Means to Carry Out the "Parsing" Function Because the "Server Control" Term in the Context of the Claim Language Provides Sufficient Structure for Software for "Parsing" on the Server ....................34

b) The Remaining Claim Language Further Provides Sufficient Structure by Describing the Input to the Server Control, a Straightforward Function, and the Output of the Server Control ....................36

c) A Person Skilled in the Art Who Created the Message Required by the Claim Would Understand the Claim to Disclose a

Sufficient Structure for Parsing the Recipient Code from that Message ................................38

C. Even if the Court Were to Hold that the Term is in Means-Plus-Function Form, the Specification Discloses Three Sufficient Structures such that the "Server Control" Term is Not Indefinite ........................................................39

D. The District Court's Grant of Summary Judgment that the Claims Are Indefinite Must Also Be Reversed Because the District Court Incorrectly Analyzed Means-Plus-Function and Reasonable Minds Differ on the Inferences Arising from the Facts .....................................................43

1. Summary Judgment Must Be Denied When Reasonable Minds Differ on the Inferences Arising from the Facts Including Whether the Claim Term is Sufficiently Definite to a Skilled Artisan..............................44

2. The District Court Clearly Erred by Failing to Consider the Unrebutted Barnett Declaration Explaining that the Claims and Specification Disclose Sufficient Structure ..................................................44

3. The District Court Erred by Failing to Apply the Appropriate Standard for Structure for Software .....................47

4. The District Court Erred by Not Construing Other Necessary Claim Terms Regarding the Structure of the Message Prior to Ruling on the Construction of the "Server Control Means".....................................................49

CONCLUSION ..........................................................................................50

# TABLE OF AUTHORITIES

**Cases**


*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
504 F.3d 1236 (Fed.Cir. 2007) .....46
*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..... 30, 44
*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed.Cir. 2014) ..... passim
*Atmel Corp. v. Information Storage Devices, Inc.*,
198 F.3d 1374 (Fed.Cir. 1999) ..... 45, 46
*Biomedino, LLC v Waters Techs. Corp.*,
490 F.3d 946 (Fed.Cir. 2007) .....39
*Cole v. Kimberly-Clark Corp.*,
102 F.3d 524 (Fed.Cir.1996) ..... 31, 36, 37
*Daly v. Sprague*,
675 F.2d 716 (5th Cir. 1982) .....30
*Eidos Display, LLC v. AU Optronics Corp.*,
779 F.3d 1360 (Fed.Cir. 2015) .....29
*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed.Cir. 2008) ..... 32, 39, 48
*Flo Healthcare Solutions, LLC v. Kappos*,
697 F.3d 1367 (Fed.Cir. 2012) ..... 31, 35
*Greenberg v. Ethicon Endo-Surgery, Inc.*,
91 F.3d 1580 (Fed.Cir. 1996) .....31
*Lighting Ballast Control LLC v Philips Electr.*,
790 F.3d 1329 (Fed.Cir. 2015) .....46
*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed.Cir. 2004) .....45
*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed.Cir. 2004) ..... passim
*Massachusetts Instit. of Tech. v. Abacus Software*,
462 F.3d 1344 (Fed.Cir. 2006) ..... passim
*Nautilus, Inc. v. Biosig Instru., Inc.*,
134 S. Ct. 2120 (2014).....45
*Noah Systems, Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed.Cir. 2012) .....46
*Olde Tyme Foods, Inc. v. Roundy's, Inc.*,
961 F.2d 200 (Fed.Cir. 1992) .....30

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed.Cir. 2003) ........................................................................29
*Personalization Media Comms., LLC v. Int'l Trade Comm'n*,
161 F.3d 696 (Fed.Cir. 1998) ..........................................................................33
*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed.Cir. 2005) (*en banc*)..........................................................45
*Power Integrations v. Fairchild Semiconductor*,
711 F.3d 1348 (Fed.Cir. 2013) ................................................................. passim
*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S.Ct. 831 (2015)..........................................................................................29
*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed.Cir. 2015) ................................................................. 29, 44
*TI Group Automotive Sys. (N.A.), Inc. v. VDA North America, LLC*,
375 F.3d 1126 (Fed.Cir. 2004) .........................................................................37
*Triple Tee Golf, Inc. v. Nike, Inc.*,
485 F.3d 253 (5th Cir. 2007) .................................................................... 29, 44
*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed.Cir. 2011) ................................................................. passim
*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed.Cir. 2015) (*en banc in part*)..................................... passim
*Xerox Corp. v. Genmoora Corp.*,
888 F.2d 345 (5th Cir. 1989) ...........................................................................30
*Young v. Lumenis, Inc.*,
492 F.3d 1336 (Fed.Cir. 2007) ................................................................. 29, 44

**Statutes**

28 U.S.C. §1295 ....................................................................................................1
28 U.S.C. §1331 ....................................................................................................1
28 U.S.C. §1338 ....................................................................................................1
35 U.S.C. §112, ¶6 ........................................................................................ passim

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ‘651 patent | U.S. Patent No. 7,173,651 (patent-in-suit) |
| Defendants | Pinterest, Inc., Smugmug, Inc., Tumblr, Inc., and Yahoo! Inc. (defendants-appellees) |
| Barnett Declaration | Declaration of James Barnett (Appx000303-Appx000314) |
| FO2GO | FO2GO LLC (plaintiff-appellant) |
| “Server Control” Term | “server control means for parsing said recipient code from each said message” (Appx000061 at col. 16:29-30) |

## STATEMENT CONCERNING ORAL ARGUMENT

Appellant FO2GO LLC requests oral argument. Especially in light of the technological nature of the patent in question and the disputed issue of whether a claim term is in means-plus-function form and, if so, whether the specification discloses sufficient structure to a person of ordinary skill in the art, a question and answer exchange between counsel and the Court would aid the decision process.

## STATEMENT OF RELATED CASES

Pursuant to the Federal Circuit Rule 47.5, FO2GO LLC, states that other than these consolidated appeals (Appeal Nos. 16-1903, -1904, -1905) no other appeal in or from the same civil action or proceeding below has been before this or any other appellate court. There are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## I. JURISDICTIONAL STATEMENT

This is a patent infringement case. FO2GO began these actions by filing Complaints alleging patent infringement. The district court had jurisdiction of the case pursuant to 28 U.S.C. §§1331 and 1338. This appeal is from the district court's March 23, 2016, Final Judgment, which disposes of all claims of all parties. (Appx0000014-15). FO2GO timely filed its Notice of Appeal on April 21, 2016. (Appx000389-391). This Court has jurisdiction pursuant to 28 U.S.C. §1295.

## II. STATEMENT OF THE ISSUES

This appeal presents the following issues for review by the Court:

1. Whether the term "server control means for parsing said recipient code from each said message" ("Server Control" Term) is in means-plus-function form when the words of the claims are understood by a person of ordinary skill in the art to have a sufficiently definite meaning as the name for structure?
2. If the "Server Control" Term is held to be in means-plus-function form, whether the figures, charts, and text in the specification disclose a sufficient structure for the "Server Control" Term to a person of ordinary skill in the art?
3. Whether the district court clearly erred by not considering an unrebutted expert declaration providing testimony on the disclosure of a sufficient structure for the "Server Control" Term in the claims and specification?
4. Whether genuine issues of fact and issues of law exist, including the Barnett Declaration and claim construction issues, that prevent Defendants from showing that the "Server Control" Term is indefinite by clear and convincing evidence?

## III. STATEMENT OF THE CASE

This appeal is from patent infringement actions brought by FO2GO LLC ("FO2GO") against the appellees/Defendants Pinterest, Inc., Smugmug, Inc., Tumblr, Inc., and Yahoo! Inc., in coordinated cases in the District of Delaware. (Appx000062, Appx000104, Appx000145).

FO2GO is the assignee of all right, title and interest in the one patent in suit, U.S. Patent No. 7,173,651 ("the '651 patent"). (Appx000064, Appx000106, Appx000147). FO2GO's managing member, Andrew Knowles, is the sole inventor on the '651 patent. (Appx000034, Appx000062, Appx000104, Appx000145).

FO2GO charged the Defendants with infringing at least claim 2 of the '651 patent. The district court held an early claim construction hearing on part of one term that Defendants contended was indefinite: "server control means for parsing said recipient code from each said message" ("'Server Control' Term"). The disputed term is part of the larger term: "server control means for parsing said recipient code from each said message, retrieving from said data base account configuration data that is associated with said recipient code, and processing each said message according to said account configuration data." (Appx000061 at col. 16:29-34). Defendants did not challenge that the claims provide a sufficiently definite structure for the remainder of the term.

The district court held that "server control means for parsing said recipient code from each said message" is in means-plus-function form under 35 U.S.C. §112, ¶6 and that there is no corresponding structure in the specification. (Appx0000013).[1] Because the claim term is found in all independent claims of the '651 patent, the district court held that all claims were indefinite and invalid. (*Id.*). FO2GO is appealing the district court's orders holding that the "Server Control" Term is in means-plus-function form, that there is no corresponding structure in the specification, and that all claims are indefinite and invalid.

### A. Background of the Invention in the '651 Patent

The '651 Patent is titled "Apparatus and System for Prompt Digital Photo Delivery and Archival." (Appx000034). The inventor is Andrew Knowles, who is the managing member of plaintiff FO2GO LLC. (*Id.*). The provisional application leading to the '651 Patent was filed on June 2, 1998, and the patent issued on February 6, 2007. (*Id.*).

The invention in the '651 Patent relates to digital cameras that "include a radio frequency (RF) transceiver for transmitting digital photos to a remote destination according to user preferences." (Appx000054 at col. 1:13-16). At the time of the invention, digital cameras were becoming increasingly popular because

[1] The identical Memorandum and Opinion was entered in all coordinated cases (Case Nos. 1:15-cv-00097-RGA, 1:15-cv-00099-RGA, and 1:15-cv-00101-RGA (D.Del.). (Appx0000012-13).

the photos did not require processing and an image could be downloaded for viewing on a computer or, after being stored on a computer, the image could be forwarded by e-mail or incorporated into other electronic documents, such as web pages. (*Id.* at col. 1:20-32). The inventor realized that there were several problems with currently available digital camera systems.

Downloading the images from a digital camera was complicated, which usually required physically connecting the digital camera to a computer, removing memory from the camera to insert into a computer, or providing an infrared port for the computer and camera. (*Id.* at col. 1:33-42). These methods of transferring the digital images detracted from being able to easily and quickly share the photos. (*Id.* at col. 1:43-52). Another issue with these methods is they required a database of images on a local computer, which had limited accessibility. (*Id.* at col. 1:53-56). The inventor realized that there was value to using RF communications to transmit images from a digital camera to a networked image storage and archival systems. (*Id.* at col. 1:57-67). Another problem that the inventor foresaw was the cost and time to wirelessly transmit images to multiple recipients. (*Id.* at col. 2:7-16). The inventor realized that this problem could be solved by allowing a user to forward an image file with distribution instructions using recipient codes to a central repository that would save the image and automatically distribute the image according to the user's instructions. (*Id.* at col. 2:16-22).

## B. Claims of the ‘651 Patent

The ‘651 patent has two independent claims, claims 1 and 2, and three dependent claims (claims 3-5) that depend from claim 2. (Appx000061). The “Server Control” Term is found in both independent claims. Claim 2, which is asserted in the complaints, will be discussed; however, the claim language discussed below with respect to claim 2 is similarly found in claim 1.[2]

### 1. Claim 2 Requires a Wireless Digital Camera Apparatus Having a Processor Control that can Send a Message Containing a Recipient Code to a Server at a Destination Address and the Server Control Parses the Recipient Code from the Message for Processing

Claim 2 is directed to a digital photo processing system comprising a wireless digital camera apparatus and a server:

> 2. Digital photo processing system comprising:
>
> at least ***one wireless digital camera apparatus***, wherein each said apparatus ***includes*** a processor, a memory, and a destination address and ***one or more previously defined recipient codes stored in said memory***; user interface connected to said processor for at least displaying one or more said recipient codes and receiving signals indicating

[2] *Compare* language for claims 1 and 2: “one wireless digital camera apparatus” (Appx000061 at col. 15:23 *with* col. 16:8), “one or more previously defined recipient codes stored in said memory” (*id.* at col. 15:25-26 *with* col. 16:10-11), “transmitting a message, including at least said selected recipient code and one said digital image, to said destination address” (*id.* at col. 15:35-37 *with* col. 16:20-22), “a server associated with said destination address and responsive to messages received at said destination address” (*id.* at col. 15:39-41 *with* col. 16:24-26), “a database storing account configuration data including recipient code data,” (*id.* at col. 15:42-43 *with* col. 16:27-28),” and “server control means for parsing said recipient code from each said message” (*id.* at col. 15:44-45 *with* col. 16:29-30).

> user selection of a displayed recipient code; a digital camera connected to said processor for capturing one or more digital images in response to signals from said user interface; a RF communications device connected to said processor; and ***processor control means***, responsive to signals received from said user interface, ***for transmitting a message, including at least said selected recipient code and one said digital image, to said destination address*** via said RF communications device; and
>
> ***a server associated with said destination address and responsive to messages received at said destination address*** from each said wireless digital camera apparatus; ***a database storing account configuration data including recipient code data***; a server communication device; and <u>*server control means for parsing said recipient code from each said message*</u>, ***retrieving from said database account configuration data that is associated with said recipient code***, ***and processing each said message according to said account configuration data***.

(Appx000061 at col. 16:7-34 (pertinent language emphasized, disputed term underlined)).

The claims require a digital camera apparatus that includes one or more previously defined recipient codes stored in memory. (*Id.* at col. 16:8-11). The term "recipient code" is described in the specification as a nickname associated with one or more destination e-mail addresses, IP addresses, phone numbers, storage destinations, and other archival or distribution locations. (Appx000055 at col. 4:7-14). The camera has a "processor control means" for transmitting a message that includes at least a recipient code and a digital image to a destination

address. (Appx000061 at col. 16:20-23). A server associated with the destination address receives the message. (*Id.* at col. 16:24-25). The server control software on the server, which has recipient code data stored in a database, parses the recipient code from the message, retrieves from the database account configuration data associated with the recipient code, and processes each message according to the account configuration data. (*Id.* at col. 16:27-30).

#### 2. The Specification Discloses the Format, Structure, and Creation of the Message Containing a Recipient Code Sent by the Digital Camera Apparatus and Parsing the Message by the Server Control

The specification discloses several examples of the format and structure of the message containing the recipient code that is sent by the digital camera apparatus to the server.

In one embodiment, Figure 16 and its accompanying text disclose a flow chart for constructing a message including a recipient code. (Appx000047 (Fig. 16), Appx000056 at col. 6:5-6; Appx000059 at col. 11:43–col. 12:5). The message is constructed with a header, recipient codes, an image, other potential information, and an end of message indicator:




FIG. 16

(Appx000047 at Fig. 16). In a manner which is well known in the art, appropriate delimiters are added within the message to indicate message field boundaries, and the current message length field is updated. (Appx000059 at col. 12:2-5).

In another embodiment, Figure 19 shows an example of a "data format for data transmitted from the wireless camera device to the server," *i.e.*, an example of a message format containing a recipient code and image, which can result from the flow chart in Figure 16:



(Appx000056 at col. 6:11-13; Appx000059 at col. 11:51-53; Appx000050 (Fig. 19)). The specification discloses that additional information can be included within the message such as account number, date, time, classification, and location. (Appx000060 at col. 13:38-41).

In addition to the structure and format of the message, the specification explains that both the digital camera and server have tables of the recipient codes. (Appx000038 (Fig.3); Appx000057 at col. 7:23-26, 32-35). These tables contain information that is used by the system to process the message in accordance with data associated with particular recipient codes. (*Id.* at col. 7:23-32, 41-56).

After describing the format and structure of the message and how the information is stored on the server, the specification explains that when the server receives the message containing the recipient code, the server software parses the information including the recipient code from the message and saves it in server memory for future access and, if a path is associated with a recipient code, saves the message at that location. (Appx000060 at col. 13:38-44; Appx000051 (Fig 20 at block 544)). The specification discloses three structures for parsing by the server. The first structure comes from the Figure 19 displaying a structure of the message including a recipient code. Figure 19 discloses that parsing the recipient code simply requires using specific parsing code in a programming language to request the recipient code. (Appx000050 (Fig. 19); *Infra* §§III.B.2, V.C). Figure

16 discloses a second structure for the parsing through the flow chart for constructing a message containing a recipient code which discloses the structure for parsing the recipient code from the message by the server. (Appx000047 (Fig. 16); *Infra* §§III.B.2, V.C). A third structure disclosed in the specification for parsing the recipient code is the text describing Figure 16. (Appx000047 (Fig. 16); Appx000047 at col. 6:5-6; Appx000059 at col. 11:43 – col. 12:1; *Infra* §§III.B.2, V.C). The text describes how the message is constructed including using delimiters to separate parts of the message and message length information, which discloses the structure for parsing the recipient code from the message by software deconstructing the message using the known contents, the delimiters, and message length. (*Id.*).

### C. The District Court Held an Early Claim Construction Hearing on One Term: "Server Control Means for Parsing Said Recipient Code from Each Said Message"

At the scheduling conference, the defendants Pinterest, Inc. ("Pinterest"), Smugmug, Inc. ("Smugmug"), Tumblr, Inc. and Yahoo! Inc. ("Tumblr/Yahoo")[3] (collectively "Defendants") requested an early, limited claim construction proceeding concerning the phrase "server control means for parsing said recipient code from each said message," which is found in both independent claims of the '651 patent. (Appx000195). Defendants contended that the term is indefinite for

[3] There were originally 12 cases involving the '651 patent that were coordinated by the district court.

failing to disclose sufficient structure under 35 U.S.C. §112, ¶6. (*Id.*). Defendants did not raise the definiteness of the remainder of the "server control means" term.[4] Defendants also did not contend that any other term, including the "processor control means" limitation, which creates the message that is parsed by the "server control means," is in means-plus-function form or indefinite.

The district court granted Defendants' request for the early claim construction hearing limited to the construction of the "Server Control" Term. (Appx000003).

### 1. Defendants Contended that the Term "Server Control Means for Parsing Said Recipient Code from Each Said Message" was in Means-Plus-Function Form and was Indefinite

Defendants argued that the "Server Control" Term was presumptively in means-plus-function form because it uses the phrase "means for" and that FO2GO could not overcome the presumption. (Appx000200-201). However, Defendants' arguments did not analyze the claim term in the context of the entire claim language. (Appx000200-201; Appx000378-380). Defendants then argued that the "Server Control" Term was indefinite by contending that the specification only used the word "pars[e]" once and parsing was a black box. (Appx000202).

[4] "server control means for… retrieving from said database account configuration data that is associated with said recipient code, and processing each said message according to said account configuration data."

### 2. FO2GO Demonstrated that the "Server Control" Term is Not in Means-Plus-Function Form and, Regardless, that the Specification Discloses a Sufficient Structure to a Person Skilled in the Art for Parsing by the Server

FO2GO responded that the "Server Control" Term is not in means-plus-function form because, despite using the word "means," the claims disclose a sufficiently definite structure to rebut the presumption in two ways. First, the term discloses the software structure of a straightforward one-step basic algorithm of analyzing the message to identify the recipient code information in a message known to contain a recipient code. Second, the parsing structure of software on the server is provided by the claims through a disclosure of the server control's operation, *e.g.*, input, output, and objective/function. Even if the term is found to be in means-plus-function form, the term is not indefinite because the specification provides corresponding structure for "parsing said recipient code from each said message" in the form of a flow chart, diagram, and text.

#### a) FO2GO Submitted the Unrebutted Barnett Declaration Demonstrating that the Claims Provided Sufficient Structure for Parsing the Recipient Code from the Message and that the Specification Also Disclosed a Sufficient Structure for Parsing

In support of its arguments on claim construction, FO2GO submitted the unrebutted expert declaration of James Barnett ("Barnett Declaration"). (Appx000303-313). The Barnett Declaration addresses two issues: (1) whether the claims disclose a sufficiently definite structure for a person skilled in the art to

implement a program to perform the parsing operation of the "Server Control" Term; and (2) whether the specification discloses a sufficiently definite structure to a person skilled in the art for the parsing operation.

As will be discussed more fully below in the context of the means-plus-function analysis, on the first issue, the Barnett Declaration explains that the claims disclose to a person skilled in the art that the server control is implemented using software on the server that performs the processing or parsing of the recipient code from a message. (Appx000306 at ¶9). In support of this position, the Barnett Declaration explains that the server control is software because the claims disclose that a message containing a recipient code is created on a digital camera that is transmitted to a server, which parses the recipient code from the message and then retrieves account configuration data associated with the recipient. (Appx000306-307 at ¶¶9-11).

The Barnett Declaration further explains that "parsing" is a well understood basic software operation to a person skilled in the art. (Appx000306 at ¶9). For example, the parsing operation is a one-line instruction in two of the most well-known languages for processing messages over HTTP. (Appx000307 at ¶11). In the context of the claims, "parsing" is also a one-step algorithm that fully discloses the structure to perform the "parsing" function." (*Id.*). The claims also disclose that the recipient code is known in advance by both the digital camera and the

server, the message includes a recipient code, and the server software parses the recipient code from the message to retrieve data associated with the recipient code. (*Id.*). With this disclosure, a person skilled in the art would have understood the claims to disclose the structure of a software implementation on the server for "parsing said recipient code from each said message." (*Id.*).

On the second issue, the Barnett Declaration explains that in view of the disclosures in the specification as to the instructions, flow chart, and diagram explaining the contents of the message, how the message is constructed, and that the server is aware of the content of the message in advance, the specification discloses a sufficiently definite structure to a person skilled in the art for "parsing said recipient code from each said message." (Appx000310-312 at ¶¶17-20, 21-22). In other words, a person skilled in the art at the time the patent was filed who is provided with a flow chart of how to create a message, prose explaining how to create the message, disclosures as to the structure and content of the message, and a diagram of a message, is therefore provided with an algorithm sufficient to implement an operative program for a "server control means for parsing said recipient code from each said message." (Appx000309 at ¶16). The Barnett declaration was not rebutted by Defendants.

**b) A Person Skilled in the Art Does Not Have to Devise a Means to Carry Out Parsing Because the Claims Disclose a Sufficient Structure for the Straightforward Software Operation of "Parsing"**

In the parties' briefing, the focus of the claim construction dispute was the word "parsing." "Parsing," as used in the claim language, is a well understood software operation to a person skilled in the art. (Appx000306-307 at ¶10). The phrase "parsing said recipient code from each said message" is a straightforward description of a specific operation described in the claims. (*Id.*). It is a one-step algorithm that discloses to a person skilled in the art the structure for implementing the "parsing" function: when a message containing a recipient code is received, the recipient code is parsed from the message by software so the server software can act upon the information. (*Id.* at ¶¶10-11). This is consistent with the definition of "parse" provided by Defendants: "To break input into smaller chunks so that a program can act upon the information." (Appx000200 at 6).

The simplicity of the one-step algorithm disclosed in the claims is demonstrated by two of the most well-known languages for creating and sending messages over the internet at the time of the invention. (Appx000307 at ¶11). There is no need for a person skilled in the art to devise or craft a parsing operation because programming languages, such as ASP and PHP, had a one-step, single-line operation to parse the "recipient code" from the message containing a recipient code when posted over the HTTP protocol:

- for ASP, “Request.Form(“Recipient_Code”)”; and
- for PHP, “$_POST(“Recipient_Code”).”

(*Id.*). The “parsing” language therefore provides a sufficiently definite structure to a person skilled in the art for the algorithm to parse the recipient code from the message. (*Id.* at ¶¶10-11).

Further explanation of the operation of “parsing said recipient code from each said message” is disclosed elsewhere in the claims through the disclosure of the contents of the message that are known by both the digital camera and the server. (Appx000306-307 at ¶12). The claims disclose to a person skilled in the art that a message, including a recipient code and digital image, is generated by the processor control means of the digital camera apparatus and transmitted to a server at a destination address. (*Id.*; Appx000061 at col. 16:20-26). The recipient code is stored both on the digital camera and the server. (Appx000307-308 at ¶12; Appx000061 at 16:10-11, 27-28). The claims also disclose that the recipient code is parsed from the message, and account configuration data associated with the recipient code is retrieved from the server. (*Id.*). Because the claims disclose that the recipient code is known in advance by both the digital camera and the server, the message necessarily includes a recipient code, and the server parses the recipient code from the message to retrieve data associated with the recipient code, a person skilled in the art would have understood the claims to disclose the

structure of a software implementation for “parsing said recipient code from each said message” and the structure to implement such a program. (Appx000307-309 at ¶¶12-15).

Notably, Defendants did not contest that the earlier claim limitation directed to a “processor control means” for transmitting a message including a recipient code is definite. (*See* Appx00061 at col. 16:20-22). In other words, Defendants did not dispute that the claims disclose to a person skilled in the art how to implement a software program to create the message. Accordingly, the instruction of “parsing said recipient code from each said message” is a straightforward operation to the skilled artisan who created the message, because the format and contents of the message are known and the message can be analyzed using its known structure to extract information on the recipient code. (Appx000307-309 at ¶¶12-14). Because the claims disclose to a person skilled in the art how to implement a software program to create the message that includes a recipient code and a digital image, the claims disclose a sufficiently definite structure to a person skilled in the art to implement a software program to parse the recipient code from that same message. (Appx000309 at ¶15)

### c) Embodiments in the Specification Disclose Sufficient Structures and Algorithms for Parsing the Recipient Code from a Message

The specification discloses embodiments of digital camera/server systems sending messages containing at least a recipient code and a digital image, and parsing the recipient code from the message. These embodiments disclose a sufficient structure to a person skilled in the art to provide an operative software program to retrieve the recipient code from the message.

In one embodiment, Figure 16 and its accompanying text disclose a process flow chart for constructing a message including a recipient code. (Appx000047 (Fig. 16); Appx000056 at col. 6:5-6; Appx000059 at col. 11:43 – col. 12:5). The message has a header, recipient codes, an image, other potential information such as account ID and audio recordings, and an end of message indicator. (*Id.*). Appropriate delimiters are added within the message to indicate message field boundaries, and the current message length field is updated in a manner which is well known in the art. (Appx000059 at col. 12:2-5). With disclosures as to the structure and contents of the message, the structure for parsing the recipient code from the message is a straightforward operation of finding the message boundaries for the recipient code information and parsing the recipient code from the message. (Appx000310 at ¶17).

In another embodiment, Figure 19 shows an example of a "data format for data transmitted from the wireless camera device to the server," *i.e.*, an example of a message format containing a recipient code and image, which can result from the flow chart in Figure 16:




(Appx000056 at col. 6:11-13; Appx000059 at col. 11:51-53; Appx000050 (Fig. 19)). The specification discloses that additional information can be included within the message such as account number, date, time, classification, and location. (Appx000060 at col. 13:38-41). This disclosure provides to a person skilled in the art the structure for implementing a software program to create a message in this format and the skilled artisan is also provided with a sufficient structure for implementing a software program to parse the recipient code from the message. (Appx000310-311 at ¶18).

The specification discloses another embodiment in which the digital camera and the server both have tables of the recipient codes. For example, Figure 3 is a representative configuration table containing recipient code information that is found both on the digital camera and the server. (Appx000038 (Fig. 3); Appx000057 at col. 7:23-26, 32-35). When the structure of the message is known by both the digital camera and server, and both the digital camera and server have

information on the recipient codes that can be within the message, the specification provides sufficient disclosures of an algorithm for a person skilled in the art to implement a software program to parse the recipient code from a message. (Appx000311 at ¶19).

After the specification describes how the message is created, the structure of the message, and how the information on recipient codes is stored on both the digital camera and server, the specification then explains that when the server receives the message it parses the information including the recipient code from the message. (Appx000060 at col. 13:38-44; Appx000051 (Fig 20 at block 544)). There is no further specificity required to provide sufficient instructions to a person of ordinary skill in the art regarding the structure for parsing the recipient code from the message. (Appx000311-312 at ¶21). "Parsing said recipient code from each said message" is a clear and unambiguous description of the server control's operation to a person skilled in the art. (*Id.*). For example, in the main programming languages for internet transmissions at the time of the invention, the parsing function was a specific and basic one-line operation. (*Id.* at ¶¶20, 11). When a message with a known structure is received and it is known where the recipient code is found within the message, the limitation is a straightforward one step instruction: parse the recipient code from the message. (*Id.*).

### D. The District Court Incorrectly Held that the Claim Term is in Means-Plus-Function Form and is Indefinite

The district court's opinion stated that there were two questions before the court: "(1) whether the claim term is means-plus-function, and (2) if so, whether the specification discloses sufficient structure." (Appx000006). Although the district court stated that it was appropriate to consider expert declarations in its analysis, the district court's opinion did not consider the Barnett Declaration. (*See* Appx000004).

#### 1. The District Court Incorrectly Analyzed Whether the Claim Term is in Means-Plus-Function Form

On the first question, the district court held that the "key issue [in a means-plus function analysis] is whether the claim itself recites sufficient structure to rebut the means-plus-function presumption." (Appx000006). Because the "Server Control" Term used the word "means," the district court held that cases addressing the structure of software for terms that did not use the word "means" were irrelevant to the means-plus-function analysis for terms using the word "means." (Appx000006-7).

The district court's analysis then focused solely on the word "parsing," without considering any other claim limitations. The district court correctly stated that FO2GO argued that "the 'parsing' phrase provides sufficient instructions to perform the required function, particularly in view of the disclosed contents of the

message in the claim." (Appx000007) (emphasis added). Yet, the district court never analyzed the entire parsing phrase or the other claim language discussing the contents of the message. Instead, the district court focused solely on the word "parsing" to hold that "[t]here is no structure within the claim itself." (Appx000007). The district court also did not address the unrebutted Barnett Declaration, which explained that "parsing" is straightforward one-step operation that provides a sufficiently definite structure to a person skilled in the art of the algorithm to perform the function. (*Supra* §III.C.2.a).

### 2. The District Court Incorrectly Held that the Specification Did Not Provide Sufficient Structure Resulting in the District Court Holding that the Claims Are Indefinite

In the second step of the analysis, the district court did not properly analyze the specification or consider the declaration of a person skilled in the art.

The district court did not dispute FO2GO's arguments regarding the disclosures in the specification:

- "the specification provides a 'blueprint of the message format and structure'" for a person skilled in the art to "'implement a program to parse the recipient code from the message.'";
- the specification has:
    - a flow chart "disclosing 'how to construct a message,'"
    - "'embodiments [which] provide examples of what can be included within the message and explain that the parts of the message are separated with appropriate delimiters to indicate field message boundaries,'"

- “a disclosure ‘that the server has tables of recipient codes before receiving the message,’” and
- “‘a diagram of the message containing the recipient and image.’”

(Appx000009 (*quoting* FO2GO Br. (Appx000271-273), and citing the ‘651 patent (Appx000056 at col. 6:5-6, 6:11-13; Appx000057 at col. 7:23-35; Appx000059 at col. 11:43-12:5; Appx000038 (Fig. 3), Appx000047 (Fig. 16); Appx000050 (Fig. 19)); Appx000010). The district court did also not dispute that “parsing is a simple function.” (Appx00008).

However, the district court contended that these disclosures of the format and structure were “merely clues as to how an ordinary-skilled artisan might craft an algorithm” for parsing the recipient code from the message. (Appx000009-10). The district court did not consider the unrebutted Barnett Declaration which stated that, in view of the disclosures in the specification as to the instructions, flow chart, and diagram explaining the contents of the message and how to construct it, “parsing said recipient code from each said message” is a basic, straightforward, and has a sufficiently definite structure to a person skilled in the art. (Appx000311-312 at ¶¶21-22). The district court concluded that the specification was devoid of any algorithm or step-by-step procedure for performing the claimed function. (Appx000010). The district court held that the “Server Control” Term was indefinite and invalidated all claims of the ‘651 patent; however, the district

court did not hold that indefiniteness was shown by clear and convincing evidence. (Appx000010-11).

The district court entered an order holding that the term “server control means for parsing said recipient code from each said message” is a means-plus-function limitation and there is no corresponding structure in the specification. (Appx000013). As a result, the district court held that all claims of the ‘651 patent are indefinite and entered judgment of invalidity. (Appx000015).

## IV. SUMMARY OF THE ARGUMENT

The district court erred by holding that the "Server Control" Term was in means-plus-function format, that the specification did not disclose a sufficient structure for the "Server Control" Term, and that all claims in the '651 patent were indefinite and invalid. The disclosures of the claims and specification of the '651 patent, supported by the Barnett Declaration, demonstrate that there is sufficient structure disclosed in the claims such that the "Server Control" Term is not in means-plus-function form and, furthermore, that there is sufficient structure disclosed in the specification such that the "Server Control" Term is not indefinite.

The "Server Control" Term is not in means-plus-function form because the term as used in the claim has a sufficiently definite meaning as to the name for structure. The server control is software on the server. "Parsing" is a term used in common parlance to a person skilled in the art to designate structure. It is a basic, clear and unambiguous software operation and is a one-step algorithm. The claims also describe an input, a straightforward function, and an output of the server control such that there are sufficient disclosures within the claims to avoid means-plus-function claiming. The structure for parsing is software, the location is on the server, the input is the message containing the recipient code, and the output is using the recipient code to retrieve account configuration data associated with the recipient code to further process the message. The claims also provide a

sufficiently definite structure for parsing the recipient code from the message because the structure for parsing by software is disclosed through the creation of the message earlier in the claims. The claims therefore disclose a sufficient structure to a person skilled in the art to implement an operative software program for the parsing operation such that the "Server Control" Term is not in means-plus-function form.

Even if the Court were to hold that the "Server Control" Term is in means-plus-function form, the specification discloses a sufficient structure for the parsing operation such that the term is not indefinite. The algorithms for parsing are provided in the '651 patent through text, diagrams, and flowcharts, including Figures 16, 19, 20 and col. 6:5-6, 11-13, and col. 11:43 – col. 12:5, disclosing a detailed blueprint in the specification for the message to be parsed, which sets the structure for the parsing operation. In other words, a person skilled in the art would have understood the disclosures in the specification to encompass software for parsing a recipient code from a message and disclose a sufficient structure to implement such a parsing function.

The district court's grant of summary judgment of indefiniteness must also be reversed because the district court did not apply the correct standard by failing to consider the appropriate case law on sufficient structure for software terms. The district court also disregarded the Barnett Declaration, which provided unrebutted

evidence explaining why the claims disclosed sufficient structure and why the specification disclosed a sufficient structure to a person skilled in the art. At a minimum, the district court erred by limiting the early claim construction hearing to only the “Server Control” Term, when the construction of the other terms of the claim were necessary to construe the “Server Control” Term. The district court also did not hold that indefiniteness was proved by clear and convincing evidence.

FO2GO therefore respectfully requests that this Court reverse the district court’s claim construction that the “Server Control” Term is in means-plus-function format, reverse the district court’s holding that the specification does not disclose sufficient structure for the “Server Control” Term, reverse the district court’s holding that the “Server Control” Term is indefinite, and reverse the district court’s order invalidating all claims of the ‘651 patent.

## V. ARGUMENT

### A. Standards of Review

Claim construction is a question of law that is reviewed *de novo*, with any subsidiary fact finding reviewed for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837 (2015).

Whether a claim term invokes Section 112, ¶6, means-plus-function, is a question of law that is reviewed *de novo*. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed.Cir. 2014).

Indefiniteness is a legal issue reviewed *de novo*. *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364 (Fed.Cir. 2015). Indefiniteness must be shown by clear and convincing evidence. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed.Cir. 2015) (*on remand from Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837 (2015)).

A grant of summary judgment is also reviewed *de novo* reapplying the same standards as the district court and without deference to the district court's determinations. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed.Cir. 2007); *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed.Cir. 2003); *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). In analyzing summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986). Even if the facts are undisputed, if reasonable minds might differ on the inferences arising from the undisputed facts, summary judgment must be denied. *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 352 (5th Cir. 1989); *Daly v. Sprague*, 675 F.2d 716, 725 (5th Cir. 1982); *Olde Tyme Foods, Inc. v. Roundy's, Inc.*, 961 F.2d 200, 202 (Fed.Cir. 1992).

## B. The "Server Control" Term is Not in Means-Plus Function Form

The claims of the '651 patent provide a sufficiently definite structure for "server control means for parsing said recipient code from each said message" so that the term is not in means-plus-function form.

### 1. Statement of the Law on the Means-Plus-Function Analysis

A means-plus-function analysis under 35 U.S.C. §112, ¶6 requires the Court to first determine "if the claim limitation is drafted in means-plus-function format." *Apple*, 757 F.3d at 1296. The standard for determining whether a claim limitation is drafted in means-plus-function format is to determine "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed.Cir. 2015) (*en banc in relevant part*). The use of the word "means" creates a rebuttable presumption that §112, ¶6 applies. *Id.* at 1349.

**a) A Term is Not in Means-Plus-Function Form if the Words Are Understood by Persons of Ordinary Skill to Have a Sufficiently Definite Meaning as to the Name for Structure**

"Merely because a named element of a patent claim is followed by the word 'means,' however, does not automatically make that element a 'means-plus-function' element under 35 U.S.C. §112, ¶6." *Williamson*, 792 F.3d at 1349 (*en banc in relevant part*) (*citing Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed.Cir. 1996)). A claim limitation that uses the term "means" only invokes a rebuttable presumption that the term is written in means-plus-function form. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319 (Fed.Cir. 2004). "The essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349 (*citing Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed.Cir. 1996) ("What is important is… that the term, as the name for structure, has a reasonably well understood meaning in the art.")).

The presumption of means-plus-function form is rebutted when a claim recites a "sufficient structure, material, or acts within the claim itself to perform entirely the recited function." *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed.Cir. 2012) (*overruled in part on other grounds* (heightened presumption) *by Williamson*, 792 F.3d at 1349). For example, a term "in

combination with [ ] a clear and unambiguous description of the [term's] operation weighs heavily in favor [of] finding sufficient structure to avoid means-plus-function claiming." *Power Integrations v. Fairchild Semiconductor*, 711 F.3d 1348, 1365 (Fed.Cir. 2013). The Court must therefore "construe the claim limitation to decide if it connotes 'sufficiently definite structure' to a person of ordinary skill in the art" to avoid means-plus-function form. *Apple*, 757 F.3d at 1296.

**b) A Sufficient Structure is Disclosed if One Skilled in the Art Would Have Understood that the Disclosure Encompasses Server Software for the Claimed Function and the Disclosure is Sufficient to a Skilled Artisan to Implement Such a Program**

In the art of computer-implemented inventions, the "structure" to a person of ordinary skill in the art may differ from traditional mechanical structures. *Apple*, 757 F.3d at 1296. "Looking for traditional 'physical structure' in a computer software claim is fruitless because software does not contain physical structures." *Id.* For computer software, a sufficient structure requires the disclosure of an algorithm. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed.Cir. 2011). Algorithm has a broad meaning and can be described in "any understandable terms, including…, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon*, 659 F.3d at 1385 (*quoting Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed.Cir. 2008)).

"Structure may also be provided by describing the claim limitation's operation…." *Apple*, 757 F.3d at 1299. For example, describing the operation by disclosing an input, output, and objective is sufficient to disclose structure. *Massachusetts Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed.Cir. 2006); *Apple*, 757 F.3d at 1299; *Linear*, 379 F.3d at 1320-1321. Even if a "broad class of structures" could be used to provide the claimed function, the term is definite if "the function recited is sufficiently clear, and definitely described, to suggest to the ordinarily skilled artisan a defined class of structures." *Power Integ.*, 711 F.3d at 1365; *also Apple*, 757 F.3d at 1300 (*citing Personalization Media Comm'ns., LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir. 1998)). "The patent need only disclose sufficient structure for a person of skill in the field to provide or implement an operative software program for the specified function." *Apple*, 757 F.3d at 1298 (*quoting Typhoon*, 659 F.3d at 1385).

### 2. The Claims Provide a Sufficiently Definite Structure for "Server Control Means for Parsing Said Recipient Code from Each Said Message" Such that the Term is Not in Means-Plus-Function Form

The "Server Control" Term is not in means-plus-function form, and the presumption of means-plus-function form is overcome, for several reasons. First, "server control means for parsing said recipient code from each said message" alone provides sufficient structure because it is sufficiently clear and definitely describes a defined class of structure to a person of ordinary skill in the art.

Second, the claims also disclose an input, objective, and output sufficient to disclose structure to overcome the presumption of means-plus-function form. *Massachusetts Instit.*, 462 F.3d at 1356; *Apple*, 757 F.3d at 1299; *Linear Tech.*, 379 F.3d at 1320-1321. Third, the disclosure to a person of ordinary skill in the art for creating a message containing a recipient code also discloses the structure for parsing the recipient code from that same message. Because the term is not in means-plus-function form the "Server Control" Term is not indefinite.

#### a) A Person Skilled in the Art Does Not Need to Devise a Means to Carry Out the "Parsing" Function Because the "Server Control" Term in the Context of the Claim Language Provides Sufficient Structure for Software for "Parsing" on the Server

The "Server Control" Term is not in means-plus-function form because, in the context of the claims, the recited "parsing" operation for the server control is "sufficiently clear, and definitely described, to suggest to the ordinary skilled artisan a defined class of structures." *Power Integ.*, 711 F.3d at 1365. Initially, there is no dispute that the "server control" is software on the server. (Appx000061 at col. 16:24, 29; Appx000202 ("It thus echoes the function recited in the claims by stating that the server 'parses…'"); Appx000377 ("how the server parses a recipient code from the received message"), Appx000379 ("how the software that is the 'server control means' performs the 'parsing' function"; "whether the software implementing the 'parsing' function….")). With respect to

the disclosures in the claim, the dispute boils down to whether the "parsing" phrase is "used in common parlance or by ordinarily skilled artisans to designate sufficiently definite structure" for the software. *Power Integ.*, 711 F.3d at 1365.

"Parsing" information from a message is a basic, clear and unambiguous software operation to a person skilled in the art and is a one-step algorithm: analyzing the message to identify the recipient code to act upon. *Id.*; (Appx000306-307 at ¶¶9-11). The parsing operation described in the claims is also consistent with the dictionary definition provided by Defendants: "To break input into smaller chunks so that a program can act upon the information." (Appx000200). The claims state that the server can receive a message containing a recipient code, parse the recipient code from the message, and then retrieve account configuration data associated with the recipient code. (Appx000061 at col. 16:24-27, 29-34). Because the claim contains a term that is used in common parlance or by a person of skill in the art to designate structure, mean-plus-function does not apply. *Apple*, 757 F.3d at 1301 (*citing Flo Healthcare*, 697 F.3d at 1374 (*quoting Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359 (Fed.Cir. 2004)); *see Power Integ.*, 711 F.3d at 1365 (comparing magnitudes of two signals is a straightforward function that does not require further description).

The skilled artisan does not need to devise or craft a means for parsing code. Instead, when a message is received containing a recipient code, in order to parse

the recipient code from a message containing a recipient code, a person of ordinary skill in the art need only use a well-known one-step software operation, *e.g.*:

- for ASP code, "Request.Form("Recipient_Code")"; or
- for PHP code, "$_POST("Recipient_Code")."

(Appx000307 at ¶11). Even though the "straightforward [claimed] function" may be provided by a "broad class of structures," the "function recited is sufficiently clear, and definitely described, to suggest to the ordinary skilled artisan a defined class of structures." *Power Integ.*, 711 F.3d at 1365.

#### b) The Remaining Claim Language Further Provides Sufficient Structure by Describing the Input to the Server Control, a Straightforward Function, and the Output of the Server Control

The "Server Control" Term is a term in which the "perfunctory addition of the word 'means' [does] nothing to diminish the precise structural character of the element." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (1996). The claims describe an input, a straightforward function, and an output of the server control such that there are sufficient disclosures within the claim to avoid means-plus-function claiming. *Massachusetts Instit.*, 462 F.3d at 1356; *Apple*, 757 F.3d at 1299; *Linear Tech*, 379 F.3d at 1320-1321; *Power Integ.*, 711 F.3d at 1365.

As explained above, there is no dispute that the claims describe that software is the structure for parsing and the software is located on the server. (*Supra* §V.B.2.a). The claims also describe the input, straightforward function, and output

of the parsing operation. The input to the server control is a message containing a recipient code that is sent by the digital camera specifically to the server, which is responsive to such messages. (Appx 000061 at col. 16:18-27; Appx 000308 at ¶13). The server control operation is the straightforward function of the server to parse the recipient code from the message containing the recipient code and then retrieving account configuration data associated with the recipient code. (Appx 000061 at col. 16:29-34; Appx 000306-308 at ¶¶10, 13). As explained above, "parsing" is a defined operation in the art. (Appx000306-307 at ¶10). The output is the recipient code that is used by the server to retrieve account configuration data from the database to further process the message. (Appx000061 at col. 16:30-34; Appx000308 at ¶13). A person skilled in the art would therefore have been provided with sufficient structure for an operative software program for the parsing function. (Appx000308-309 at ¶¶13-14). Because of the specificity of the structure in the claims (including the structure, location, input, operation, and output), merely using the word "means" does not transform this element into a means-plus-function element and the presumption is therefore overcome. *Cole,* 102 F.3d at 531; *TI Group Automotive Sys. (N.A.), Inc. v. VDA North America, LLC*, 375 F.3d 1126, 1135 (Fed.Cir. 2004). No further instructions or explanations are required to explain the structure of "parsing said recipient code from each said message" to a person skilled in the art. (Appx000308). The "Server Control"

Term should therefore not be construed to be in means-plus-function form and is sufficiently definite.

#### c) A Person Skilled in the Art Who Created the Message Required by the Claim Would Understand the Claim to Disclose a Sufficient Structure for Parsing the Recipient Code from that Message

The claims provide a sufficiently definite structure for parsing the recipient code from the message because the structure is disclosed to the person of ordinary skill in the art who was likewise required by the claim to create the message. The claim limitations directed to the digital camera apparatus require a "processor control means" for transmitting a message including a recipient code to the destination address associated with the server. (Appx000061 at col. 16:18-23). Defendants have not disputed that the claims provide a person skilled in the art with sufficient structure to create a message containing a recipient code.

After the message is sent to the server, the claims require that the server control be able to parse the recipient code from the message. (Appx000061 at col. 16:29-34). Because the format and contents of the message are known by the skilled artisan who created the message, the same skilled artisan would be provided with sufficient structure for parsing the recipient code from the message that the skilled artisan created. (Appx000307-309 at ¶¶12-15). In other words, if a skilled artisan created a package containing a recipient code and mailed the package to himself or herself, the skilled artisan would know how to open the package, and

the structure to open the package, to parse the recipient code. (*Id.*). The "Server Control" Term is therefore not in means-plus-function form because the creation of a message containing a recipient code provides a sufficient structure for parsing a recipient code from that same message.

### C. Even if the Court Were to Hold that the Term is in Means-Plus-Function Form, the Specification Discloses Three Sufficient Structures such that the "Server Control" Term is Not Indefinite

Although the "Server Control" Term should not be construed to be in means-plus-function form, the specification discloses a sufficient structure for the parsing operation such that the term is not indefinite. "While the specification must contain a structure linked to claimed means, this is not a high bar: …." *Biomedino, LLC v Waters Techs. Corp.*, 490 F.3d 946, 951 (Fed.Cir. 2007).

For computer software, a sufficient structure requires the disclosure of an algorithm. *Typhoon*, 659 F.3d at 1384. Algorithm has a broad meaning and can be described in "any understandable terms, including…, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id.* at 1385 (*quoting Finisar*, 523 F.3d at 1340). In the '651 patent, the algorithm for parsing is provided through text, diagrams, and flowcharts disclosing a detailed blueprint in the specification for the message to be parsed, which sets the structure for the parsing operation. In other words, a person skilled in the art would have understood the disclosures in the specification to encompass software for parsing a

recipient code from a message and disclose a sufficient structure to implement such a parsing function.

The most straightforward structure disclosed in the specification for the parsing algorithm is the Figure 19. Figure 19 shows the structure of the message received by the server control:




(Ex. A at col. 6:11-13, 11:51-53; Fig. 19). With this disclosure, a person skilled in the art would understand the disclosure to encompass particular code, *i.e.*, the specific programming language instruction or operation, for parsing the recipient code and the disclosure is sufficient to implement the parsing operation, *e.g.*:

- for ASP code, “Request.Form(“RECIPIENT/ADDR”)”; or
- for PHP code, “$_POST(“RECIPIENT/ADDR”).”

(Appx000307 at ¶11; Appx000310-311 at ¶¶17-18). A person skilled in the art would not need to devise a structure for parsing because the structure for parsing is disclosed as a result of the images of the message structure containing the recipient code. (Appx000307 at ¶11; Appx0003010-312 at ¶¶18, 21).

A second structure in the specification that discloses to a skilled artisan the structure for parsing the recipient code from the message is found in Figure 16:




FIG. 16

(Appx000047 (Fig. 16); Appx000056 at col. 6:5-6; Appx000059 at col. 11:43 – col. 12:5; Appx000308-309 at ¶14). Defendants do not dispute that a person skilled in the art would know how to construct a message containing a recipient code, particularly as disclosed in Figure 16. In order to parse the recipient code from the message created by the above flow chart, a person skilled in the art would simply use this flow chart to implement a program to deconstruct the message to parse the recipient code.

Furthermore, a related third structure disclosed in the specification is the text describing Figure 16. The text explains that the message has various contents

including a header, recipient code(s), an image, other potential information such as account ID and audio recordings, and an end of message indicator. (Appx000047 (Fig. 16); Appx000056 at col. 6:5-6; Appx000059 at col. 11:43–col. 12:1). The various parts of the message are separated by appropriate delimiters to indicate message field boundaries in a manner that is well-known in the art. (Appx000047 (Fig. 16), Appx000059 at col. 12:1-5). After the message is constructed, the specification states that the message is sent to the server. The server is awaiting messages from the camera that contain recipient codes and also has information regarding the recipient codes it anticipates receiving. (Appx000057 at col. 7:23-26, 32-35; Appx000038 (Fig. 3)). Upon receiving the message, the server "parses out information" from the message, including the recipient code. (Appx000060 at col. 13:38-44). These disclosures as to the structure and contents of the message sufficiently disclose the structure for parsing the recipient code from the message as the straightforward operation of parsing the recipient code using the message boundaries that separate the fields. (Appx000310-312 at ¶¶17, 21-22). The specification therefore informs, with reasonable certainty, a person skilled in the art of a sufficient structure and scope of the "Server Control" Term to implement a program to parse the recipient code from a message. (*Id.*).

In sum, a person skilled in the art at the time the patent was filed who is provided with the disclosures in the specification of a flow chart of how to create a

message, prose explaining how to create the message, disclosures as to the content of the message, and a diagram of a message would be provided with an algorithm sufficient to disclose the structure of a program for a "server control means for parsing said recipient code from each said message." The term therefore reasonably informs a person skilled in the art at the time of the filing of the patent as to the sufficiently definite scope of the limitation. (Appx000312 at ¶22). The "Server Control" Term is therefore not indefinite.

### D. The District Court's Grant of Summary Judgment that the Claims Are Indefinite Must Also Be Reversed Because the District Court Incorrectly Analyzed Means-Plus-Function and Reasonable Minds Differ on the Inferences Arising from the Facts

The district court's grant of summary judgment holding that the "Server Control" Term is in means-plus-function form and that the specification did not disclose a sufficient structure such that the term is indefinite must also be reversed because the court did not appropriately analyze the facts and law. First, the district court ignored the unrebutted declaration of a person skilled in the art explaining where and how the claim language and the specification disclosed a sufficient structure. Second, the district court did not apply the correct standard for determining structure for software by disregarding relevant case law. Finally, there are genuine issues of fact and issues of claim construction that must be addressed prior to ruling on the construction of the "Server Control" Term and prevent

holding that the "Server Control" Term is indefinite by clear and convincing evidence.

### 1. Summary Judgment Must Be Denied When Reasonable Minds Differ on the Inferences Arising from the Facts Including Whether the Claim Term is Sufficiently Definite to a Skilled Artisan

Summary judgment is appropriate only when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Young*, 492 F.3d at 1345; *Triple Tee Golf*, 485 F.3d at 261. In analyzing summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Defendants have the burden of proving indefiniteness by clear and convincing evidence. *Teva Pharms.*, 789 F.3d at 1345.

### 2. The District Court Clearly Erred by Failing to Consider the Unrebutted Barnett Declaration Explaining that the Claims and Specification Disclose Sufficient Structure

The district court clearly erred by failing to consider the Barnett Declaration, which explained why the term "parsing" and the remaining claim language disclosed sufficient structure for the "Server Control" Term. Granting summary judgment of indefiniteness was also improper without considering the unrebutted Barnett Declaration stating that certain disclosures in the specification indicated to

one skilled in the art sufficient structure for the "Server Control" Term. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed.Cir. 1999).

This Court has held that expert testimony is relevant to a means-plus-function determination and has considered such testimony, like in any claim construction issue. *Lighting World*, 382 F.3d at 1358 (*overruled in part on other grounds* (heightened presumption) by *Williamson*, 792 F.3d at 1349); *Linear*, 379 F.3d at 1320. Similarly, all of the standards for analyzing claim construction, means-plus-function, and indefiniteness are also viewed from the scope of a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir. 2005) (*en banc*) ("the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention"); *Williamson*, 792 F.3d at 1349 (*en banc*) (whether a claim limitation is drafted in means-plus-function format is to determine "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."); *Nautilus, Inc. v. Biosig Instru., Inc.*, 134 S. Ct. 2120, 2128 (2014) ("definiteness is to be evaluated from the perspective of someone skilled in the relevant art"). Furthermore, expert testimony of a person of ordinary skill in the art is particularly relevant where, as in this case, the claims and the specification disclose an algorithm that the Defendants contend is inadequate. *Lighting Ballast Control*

*LLC v Philips Electr.*, 790 F.3d 1329, 1339 (Fed.Cir. 2015); *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed.Cir. 2007); *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1313 (Fed.Cir. 2012); *Atmel*, 198 F.3d at 1382.

FO2GO submitted the Barnett Declaration to provide evidence of how a person skilled in the art at the time of the invention would have understood the claims and specification. The Barnett Declaration served two purposes. First, the Barnett Declaration explained that the claim language, through the word "parsing" in addition to other limitations in the claim, disclose a sufficiently definite structure to rebut the presumption that the "Server Control" Term is in means-plus-function form. (Appx000306-309 at ¶¶9-15). Second, the Barnett Declaration explained that, in the event the "Server Control" Term is found to be in means-plus-function form, the specification contains a sufficiently definite structure, in this case an algorithm, of the "Server Control" Term to satisfy Section 112, ¶6. (Appx000309-312 at ¶¶16-22). Defendants did not rebut the testimony in the Barnett Declaration.

The district court clearly erred by failing to consider the Barnett Declaration, which at a minimum raised genuine issues of material fact and prevented Defendants from proving indefiniteness. *Atmel*, 198 F.3d at 1382 ("the district court erred by failing to consider the knowledge of one skilled in the art that indicated, based on unrefuted testimony, that the specification disclosed sufficient

structure corresponding to the [ ] means limitation….”). The holdings that the "Server Control" Term is in means-plus-function format and indefinite must therefore be reversed.

### 3. The District Court Erred by Failing to Apply the Appropriate Standard for Structure for Software

In the first step of the means-plus-function analysis, the district court failed to correctly analyze the structure for software terms. FO2GO cited appellate cases using nonce words, but not the word "means," to state the law on what constitutes structure for software terms. The district court held that FO2GO could not rely on such cases because they did not involve the word "means." (Appx000006-7[5]). However, the district court's decision to ignore cases in which the word "means" was not used "blindly elevates form over substance when evaluating whether a claim limitation invokes §112, para. 6." *Williamson*, 792 F.3d at 1348.

The standard applied for the means-plus-function analysis, which was unaffected by *Williamson,* remains the same regardless of whether "means" is used: "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure"; only

[5] *See* Appx000264 (*citing Apple*, 757 F.3d at 1298-1299; *Power Integrations*, 711 F.3d at 1365; *Typhoon*, 659 F.3d at 1384; *Massachusetts Instit.*, 462 F.3d at 1356; *Linear Tech.*, 379 F.3d at 1320-21). *Williamson* only overruled these case to the extent the cases applied a heighted presumption; however, the other standards applied in the cases, including determining structure for software, remain valid and unchanged. 792 F.3d at 1349.

the presumption changes. *Id.* Cases addressing means-plus-function are therefore equally applicable in analyzing the law regardless of whether "means" is used. *See id.*

By disregarding the cases cited by FO2GO, the district did not apply the appropriate analysis for structure for software. For software, a sufficient structure requires the disclosure of an algorithm, which has a broad meaning and can be described in "any understandable terms, including…, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon*, 659 F.3d at 1385 (*quoting Finisar*, 523 F.3d at 1340). An algorithm can also be provided by describing the claim limitation's operation such as by disclosing an input, output, and objective. *Massachusetts Instit.*, 462 F.3d at 1356; *Apple*, 757 F.3d at 1299; *Linear*, 379 F.3d at 1320-1321. FO2GO disclosed sufficient algorithms found in the claims, yet the district court never analyzed the claim language in this manner and instead focused solely on the word "parsing." *Compare* Appx000007 (addressing solely the word "parsing") *with* Appx000268-270 (explaining algorithm disclosed in claims)). If the district court had applied the proper analysis for determining a sufficient structure for software, as explained above, the court would have found that the claims and specification disclosed an algorithm for parsing. (*Supra* §§V.B.2, V.C).

#### 4. The District Court Erred by Not Construing Other Necessary Claim Terms Regarding the Structure of the Message Prior to Ruling on the Construction of the "Server Control Means"

The district court erred by limiting the early claim construction hearing to only the "Server Control" Term, when the construction of other terms of the claim were necessary to construe the "Server Control" Term. A means-plus-function analysis involves the analysis of the "Server Control" Term in the context of the claim, which involves construction of other terms. As explained above, the "Server Control" Term requires consideration of the terms related to the creation of the message containing the recipient code at the digital camera apparatus and the receipt of the message at the server:

- "transmitting a message, including at least said selected recipient code and one said digital image, to said destination address,"
- "a server associated with said destination address and responsive to messages received at said destination address… from each said wireless digital camera apparatus," and
- "a database storing account configuration data including recipient code data."

(*Supra* §V.B.2.b). As explained above, these terms explain the algorithm for the parsing operation by explaining the input, output, and function of the "Server Control" Term. (*Id.*). By failing to consider these terms, the district court incorrectly analyzed the means-plus-function standard and the algorithm disclosed for the "Server Control" Term. The district court's construction of the "Server

Control" Term was therefore premature without considering the meaning of the other terms in the claims. The holdings that the "Server Control" Term is in means-plus-function format and indefinite therefore must be reversed to allow the construction of the other terms.

## CONCLUSION

FO2GO respectfully requests that this Court reverse the district court's claim construction of the term "server control means for parsing said recipient code from each said message" and hold that the term is not in means-plus-function form.

FO2GO further respectfully requests that this Court reverse the district court's holding that the term "server control means for parsing said recipient code from each said message" is indefinite, and hold that there is corresponding structure in the specification and the term is not indefinite.

FO2GO further respectfully requests that this Court reverse the district court's holding that claims 1-5 of U.S. Patent No. 7,173,651 are invalid.

Dated: June 20, 2016

Respectfully submitted,

*/s/David R. Bennett*

David R. Bennett
*Counsel of Record*
DIRECTION IP LAW
P.O. Box 14184
Chicago, IL 60614-0184
Telephone: (312) 291-1667
e-mail: dbennett@directionip.com
*Attorney for Plaintiff-Appellant*
*FO2GO LLC*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FO2GO LLC,<br>Plaintiff,<br>v.<br>ADOBE SYSTEMS INC.,<br>Defendant. | Civil Action No. 15-89-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>MYSPACE LLC,<br>Defendant. | Civil Action No. 15-95-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>PINTEREST, INC.,<br>Defendant. | Civil Action No. 15-97-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SMUGMUG, INC.,<br>Defendant. | Civil Action No. 15-99-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SNAPCHAT, INC.,<br>Defendant. | Civil Action No. 15-100-RGA |

Case: 16-1983 Document: 20 Page: 65 Filed: 06/20/2016

| | |
|---|---|
| FO2GO LLC,<br><br>Plaintiff,<br><br>v.<br><br>TUMBLR, INC. and YAHOO! INC.,<br><br>Defendants. | Civil Action No. 15-101-RGA |

MEMORANDUM OPINION

Stephen B. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., Richard D. Kirk, Esq., Bayard, P.A., Wilmington, DE; David R. Bennett, Esq. (argued), Direction IP Law, Chicago, IL, attorneys for Plaintiff FO2GO, LLC.

Gregory P. Williams, Esq., Steven J. Fineman, Esq., Katharine C. Lester, Esq., Richards, Layton & Finger, P.A., Wilmington, DE; Michael A. Berta, Esq., Maulik G. Shah, Esq., Arnold & Porter LLP, San Francisco, CA, attorneys for Defendant Adobe Systems Inc.

Jack B. Blumenfeld, Esq., Stephen J. Kraftschik, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Daralyn J. Durie, Esq., Ryan M. Kent, Esq. (argued), Durie Tangri LLP, San Francisco, CA, attorneys for Defendants Pinterest, Inc., Snapchat, Inc., Tumblr, Inc., and Yahoo! Inc.

Karen Jacobs, Esq., Eleanor G. Tennyson, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, attorneys for Defendants Myspace LLC and SmugMug, Inc.

Lauren Sliger, Esq., Roozbeh Gorgin, Esq., Lee, Tran & Liang LLP, Los Angeles, CA, attorneys for Defendant Myspace LLC.

Jerry R. Selinger, Esq., Patterson & Sheridan LLP, Dallas, TX, attorney for Defendant SmugMug, Inc.

February 24, 2016

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is the issue of claim construction of one term in U.S. Patent No. 7,173,651 (the "'651 patent"). The issue has been fully briefed. (D.I. 20, 26, 32).[1] The Court heard oral argument on January 5, 2016.

## I. BACKGROUND

On January 27, 2015, plaintiff FO2GO LLC filed fifteen related patent infringement lawsuits in this district, including these six actions. At the initial scheduling conference held on October 13, 2015, the Court permitted a limited early claim construction hearing to resolve the meaning of one term in the '651 patent. (D.I. 16).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks and citations omitted).

[1] Unless otherwise noted, citations to the docket are to Civil Action No. 15-89.

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal quotation marks and citations omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317-19 (internal quotation marks and citations omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would

exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

"When a claim uses the term 'means' to describe a limitation, a presumption inheres that the inventor used the term to invoke 112, ¶ 6." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). "This presumption can be rebutted when the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). Means-plus-function claiming permits a patentee to express an element of a claim as a means for performing a specified function. 35 U.S.C. § 112, ¶ 6 (2006). "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014). "A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009). The failure to disclose corresponding structure constitutes impermissible functional claiming and "renders the claim indefinite." *See Triton Tech*, 753 F.3d at 1378. "Indefiniteness, as a subset of claim construction, is a question of law." *In re Packard*, 751 F.3d 1307, 1311 (Fed. Cir. 2014).

## III. ANALYSIS

Claim 2 is representative[2] and reads:

Digital photo processing system comprising:

> at least one wireless digital camera apparatus, wherein each said apparatus includes a processor, a memory, and a destination address and one or more

[2] The claim language at issue is found in both claims 1 and 2. The parties agree that the claims do not materially differ with respect to the claim language at issue. (D.I. 20 at 8-10; D.I. 26 at 9-10).

> previously defined recipient codes stored in said memory; user interface connected to said processor for at least displaying one or more said recipient codes and receiving signals indicating user selection of a displayed recipient code; a digital camera connected to said processor for capturing one or more digital images in response to signals from said user interface; a RF communications device connected to said processor; and processor control means, responsive to signals received from said user interface, for transmitting a message, including at least said selected recipient code and one said digital image, to said destination address via said RF communications device; and
>
> a server associated with said destination address and responsive to messages received at said destination address from each said wireless digital camera apparatus; a database storing account configuration data including recipient code data; a server communication device; and *server control means for parsing said recipient code from each said message*, retrieving from said database account configuration data that is associated with said recipient code, and processing each said message according to said account configuration data

('651 patent a 16:7-34) (emphasis added).

The parties dispute one term: "server control means for parsing said recipient code from each said message."

a. *Plaintiff's proposed construction*: "server control means" is not a means-plus-function limitation because sufficient structure is provided within the claims

*Plaintiff's alternative construction*: "server control means" is means-plus-function and the specification discloses sufficient corresponding structure such that the term is not indefinite

b. *Defendants' proposed construction*: "server control means for parsing" is a means-plus-function limitation without corresponding structure and is thus invalid for indefiniteness

c. *Court's construction*: "server control means for parsing" is a means-plus-function limitation without corresponding structure and is thus invalid for indefiniteness

There are two questions before the Court: (1) whether the claim term is means-plus-function, and (2) if so, whether the specification discloses sufficient structure. In addressing the first question, since the term undoubtedly contains the word "means," the key issue is whether the claim itself recites sufficient structure to rebut the means-plus-function presumption. In arguing that the presumption is rebutted, Plaintiff relies on cases relating to the converse

presumption: that the absence of the word "means" gives rise to a rebuttable presumption that the claim is not means-plus-function. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015) (en banc in relevant part). Plaintiff's reliance is misplaced. In *Williamson*, the Federal Circuit overruled earlier panel holdings that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function. *Id.* at 1349. The court explicitly held that the "converse presumption," the one at issue here, "remains unaffected," and that the "use of the word 'means' creates a presumption that § 112, ¶ 6 applies." *Id.* (internal quotation marks omitted).

Here, Plaintiff argues that "the 'parsing' phrase provides sufficient instructions to perform the required function, particularly in view of the disclosed contents of the message in the claim," and therefore, the means-plus-function presumption is rebutted. (D.I. 26 at 21). Plaintiff identifies as structure the very word which identifies the function: "parsing." There is no structure within the claim itself, however, that explains how to perform this parsing function. In order to rebut the means-plus-function presumption, "the claim, *in addition to the functional language*, [must] recite[] structure sufficient to perform the claimed function in its entirety." *Altiris*, 318 F.3d at 1375 (emphasis added). That is missing here.

The claims at issue here are thus distinguishable from those in a case like *Kimberly-Clark*, where the presumption was successfully rebutted. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996). There, the Federal Circuit found that "perforation means" was not means-plus-function because the function was "tearing" and "perforation" was the structure. *Id.* That is, in *Kimberly-Clark*, the means of achieving the function, as well as the function itself, were recited in the claims. *Id.* Further, the location and extent of the perforation was described within the claims. *Id.* Here, since the claims at issue do not recite sufficient structure to

overcome the presumption, the Court concludes that the disputed claim term is means-plus-function.

The second question is whether the specification provides sufficient structure, such that the claim is not indefinite. To satisfy this requirement, the patent must "recite some structure corresponding to the means in the specification . . . so that one can readily ascertain what the claim means." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011) (quoting *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)). "[I]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) (internal quotation marks omitted). An algorithm is a "step-by-step procedure for accomplishing a given result." *Typhoon Touch*, 659 F.3d at 1384-85 (internal quotation marks omitted). "A patentee [may] express . . . a procedural algorithm 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'" *Id.* at 1385 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)). "Failure to disclose the corresponding algorithm for a computer-implemented means-plus-function term renders the claim indefinite." *Triton Tech*, 753 F.3d at 1378.

The patent makes clear, and the parties agree, that the claimed function is implemented by a general purpose computer. (D.I. 20 at 8-9; D.I. 26 at 12-14, 16); '651 patent at 6:59-61. Therefore, the specification must "disclose the algorithm that the computer performs to

accomplish [the claimed] function." *Triton Tech*, 753 F.3d at 1378. Here, the specification contains one disclosure which explicitly references the parsing function:

> At block 544 the server receives a message, parses out information such as account number, image, audio data, date, time, classification, location, and recipient code which is included in the message, saves this in a server memory for future access and in a holding area designated for this account, and if a path is associated with the recipient code saves the message at that location.

'651 patent at 13:38-44. This statement describes the information which may be parsed out, but does not describe at all how the parsing function is performed. It therefore cannot be an algorithm. The referenced block 544 of Figure 20 similarly fails to provide an algorithm, as it merely recites the functional steps of receiving and saving the message. *See Blackboard*, 574 F.3d at 1383 ("The 'access control manager' is simply an abstraction that describes the function[,] . . . . [b]ut how it does so is left undisclosed."). This disclosure is thus "nothing more than a restatement of the function, as recited in the claim." *Finisar*, 523 F.3d at 1340. That is insufficient.

Plaintiff also argues that the specification provides a "blueprint of the message format and structure" from which a person having ordinary skill in the art would have been able to "implement a program to parse the recipient code from the message." (D.I. 26 at 7-8, 12-14, 23-25). Specifically, Plaintiff references a flow chart disclosing "how to construct a message," "embodiments [which] provide examples of what can be included within the message and explain that the parts of the message are separated with appropriate delimiters to indicate field message boundaries," a disclosure "that the server has tables of recipient codes before receiving the message," and "a diagram of the message containing the recipient and image." (*Id.* at 23-25); *see also* '651 patent at 6:5-6, 6:11-13, 7:23-35, 11:43-12:5, figs.3, 16, 19. None of these disclosures are an algorithm. They are merely clues as to how an ordinary-skilled artisan might

craft an algorithm. That is not sufficient. *See Triton Tech*, 753 F.3d at 1378-79; *Blackboard*, 574 F.3d at 1385; *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008) ("It is not enough for the patentee simply to state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function."); *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1299 (Fed. Cir. 2005) ("[S]tructure disclosed in the specification must be clearly linked to and capable of performing the function claimed."). This is akin to claiming a "cutting means" without specifying that the means for cutting may be scissors, box cutters, or a knife. "The patentee has in effect claimed everything . . . under the sun" that performs the claimed function. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2012).

Plaintiff argues that parsing is a simple function. This may indeed be true, but there is no simple function exception for the requirements of 35 U.S.C. § 112, ¶ 6. Means-plus-function claiming "incorporates a deliberate quid pro quo: the patentee is allowed to claim a limitation in broad functional language, provided that the specification indicates what structure constitutes the means for performing the claimed function." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1328-29 (Fed. Cir. 2012) (internal quotation marks omitted). Here, the specification is devoid of any "algorithm—i.e., a step-by-step procedure—for performing the claimed function." *Triton Tech*, 753 F.3d at 1379. Without such structure, "the claim limitation is indefinite [as it] fails to 'particularly point[] out and distinctly claim[]' the invention, because there is insufficient definition of something that . . . is incorporated into the claim." *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1378 (Fed. Cir. 2013) (second and third alterations in original) (quoting 35 U.S.C. § 112, ¶ 2 (2006)). This is purely functional claiming. Therefore, I find that the term is indefinite.

Since the parsing limitation is indefinite, claims 1 and 2 are indefinite. *See, e.g.*, *Net MoneyIN*, 545 F.3d at 1367. Dependent claims 3-5 are also indefinite, as they incorporate the same defective limitation found in independent claim 2. *See Ibormeith*, 732 F.3d at 1378.

## IV. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT DELAWARE**

| | |
|---|---|
| FO2GO LLC,<br>Plaintiff,<br>v.<br>ADOBE SYSTEMS INCORPORATED,<br>Defendant. | C.A. No. 15-089-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>PINTEREST, INC.,<br>Defendant. | C.A. No. 15-097-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SMUGMUG, INC.,<br>Defendant. | C.A. No. 15-099-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SNAPCHAT, INC.,<br>Defendant. | C.A. No. 15-100-RGA |

Case: 16-1903 Document: 20 Page: 76 Filed: 06/20/2016

| | |
|---|---|
| FO2GO LLC,<br><br>Plaintiff,<br><br>v.<br><br>TUMBLR, INC. and YAHOO! INC.,<br><br>Defendant. | C.A. No. 15-101-RGA |

**ORDER**

For the reasons set forth in the Court's Memorandum Opinion dated February 24, 2016, the term "server control means for parsing said recipient code from each said message" in claims 1 and 2 of U.S. Patent No. 7,173,651 ("the '651 patent") is a means-plus-function limitation for which there is no corresponding structure in the specification. Thus, claims 1 and 2 of the '651 patent, and claims 3-5 which depend from them, are indefinite.

The Court, therefore, directs the Clerk to enter judgment of invalidity of claims 1-5 of the '651 patent for the defendants and against the plaintiff.

IT IS SO ORDERED this 29 day of February, 2016.

Richard G. Andrews
HON. RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT DELAWARE**

| | |
|---|---|
| FO2GO LLC,<br>Plaintiff,<br>v.<br>PINTEREST, INC.,<br>Defendant. | C.A. No. 15-097-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SMUGMUG, INC.,<br>Defendant. | C.A. No. 15-099-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>SNAPCHAT, INC.,<br>Defendant. | C.A. No. 15-100-RGA |
| FO2GO LLC,<br>Plaintiff,<br>v.<br>TUMBLR, INC. and YAHOO! INC.,<br>Defendant. | C.A. No. 15-101-RGA |

**FINAL JUDGMENT OF INVALIDITY**

Judgment of invalidity of claims 1-5 of U.S. Patent No. 7,173,651 is hereby ENTERED for the defendants and against the plaintiff. The Clerk of the Court is directed to close these cases.

IT IS SO ORDERED this 23 day of March, 2016.

Richard G. Andrews
HON. RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

US007173651B1

(12) **United States Patent**
**Knowles**

(10) **Patent No.: US 7,173,651 B1**
(45) **Date of Patent: Feb. 6, 2007**

(54) **APPARATUS AND SYSTEM FOR PROMPT DIGITAL PHOTO DELIVERY AND ARCHIVAL**

(76) Inventor: **Andrew T. Knowles**, 521 W. Aycock St., Raleigh, NC (US) 27608

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/324,249**

(22) Filed: **Jun. 2, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/087,745, filed on Jun. 2, 1998.

(51) **Int. Cl.**
***H04N 5/225*** (2006.01)
***H04N 5/232*** (2006.01)

(52) **U.S. Cl.** ................................. **348/207.1**; 348/211.2

(58) **Field of Classification Search** ............. 348/207.1, 348/207.11, 211.1–211.6, 211.14, 143, 14.01, 348/14.04, 14.12, 552, 231.99, 333.02, 333.11, 348/211.11, 206, 204, 203; 455/517, 557, 455/556.1, 66.1, 566, 419; 396/2, 297, 310; 709/203–204, 206–207, 219, 238; 707/3, 707/10

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


4,884,132 A 11/1989 Morris
5,633,678 A 5/1997 Parulski
5,666,159 A 9/1997 Parulski
5,689,642 A * 11/1997 Harkins et al. ............. 709/207
5,712,679 A 1/1998 Coles
5,726,660 A 3/1998 Purdy
5,734,903 A * 3/1998 Saulpaugh et al. ......... 709/238
5,737,491 A * 4/1998 Allen et al. .............. 348/211.3
5,760,916 A * 6/1998 Dellert et al. ........... 348/211.11
5,760,917 A * 6/1998 Sheridan ..................... 396/429
5,768,633 A * 6/1998 Allen et al. ................. 396/310
5,806,005 A 9/1998 Hull
5,852,722 A * 12/1998 Hamilton .................... 709/221
5,861,918 A 1/1999 Anderson
5,864,684 A * 1/1999 Nielsen ...................... 709/206
5,917,542 A 6/1999 Moghadam
5,966,446 A * 10/1999 Davis .......................... 380/25
5,974,401 A * 10/1999 Enomoto et al. ........... 396/310
6,006,039 A 12/1999 Steinberg


(Continued)

*Primary Examiner*—Aung Moe

(57) **ABSTRACT**

The invention comprises a wireless camera apparatus and system for automatic capture and delivery of digital image "messages" to a remote system at a predefined destination address. Initial transmission occurs via a wireless network, and the apparatus process allows the simultaneous capture of new messages while transmissions are occurring. The destination address may correspond to an e-mail account, or may correspond to a remote server from which the image and data can be efficiently processed and/or further distributed. In the latter case, data packaged with the digital message is used to control processing of the message at the server, based on a combination of pre-defined system and user options. Secured Internet access to the server allows flexible user access to system parameters for configuration of message handling and distribution options, including the option to build named distribution lists which are downloaded to the wireless camera. For example, configuration data specified on the server may be downloaded to the wireless camera to allow users to quickly specify storage and distribution options for each message, such as archival for later retrieval, forwarding to recipients in a distribution list group, and/or immediate presentation to a monitoring station for analysis and follow-up. The apparatus and system is designed to provide quick and simple digital image capture and delivery for business and personal use.

**5 Claims, 18 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,009,336 | A * | 12/1999 | Harris et al. | 455/566 |
| 6,018,774 | A | 1/2000 | Mayle | |
| 6,023,345 | A * | 2/2000 | Bloomfield | 358/402 |
| 6,037,991 | A * | 3/2000 | Thro et al. | 348/443 |
| 6,038,295 | A | 3/2000 | Mattes | |
| 6,104,430 | A * | 8/2000 | Fukuoka | 348/552 |
| 6,166,729 | A * | 12/2000 | Acosta et al. | 709/219 |
| 6,167,283 | A * | 12/2000 | Korpela et al. | 455/525 |
| 6,167,469 | A * | 12/2000 | Safai et al. | 348/211.3 |
| 6,181,373 | B1 | 1/2001 | Coles | |
| 6,181,954 | B1 | 1/2001 | Monroe | |
| 6,223,190 | B1 * | 4/2001 | Aihara et al. | 348/552 |
| 6,295,082 | B1 * | 9/2001 | Dowdy et al. | 348/231.99 |
| 6,381,592 | B1 * | 4/2002 | Reuning | 707/10 |
| 6,396,537 | B1 * | 5/2002 | Squilla et al. | 348/239 |
| 6,427,078 | B1 * | 7/2002 | Wilska et al. | 348/14.02 |
| 6,642,959 | B1 | 11/2003 | Arai | |
| 6,657,702 | B1 * | 12/2003 | Chui et al. | 396/429 |
| 6,715,003 | B1 * | 3/2004 | Safai | 710/33 |
| 2001/0022618 | A1 * | 9/2001 | Ward et al. | 348/552 |
| 2001/0029178 | A1 * | 10/2001 | Criss et al. | 455/419 |
| 2002/0057340 | A1 * | 5/2002 | Fernandez et al. | 348/143 |
| 2002/0122061 | A1 * | 9/2002 | Martin, Jr. et al. | 345/762 |
| 2002/0167595 | A1 * | 11/2002 | Patel et al. | 348/211.3 |
| 2003/0025808 | A1 | 2/2003 | Parulski | |
| 2003/0142215 | A1 | 7/2003 | Ward | |

* cited by examiner


150
150
160
170
External Network
140
130
Radio Network
260
190
194
196
192
110
120
180
260
100
196
110'

FIG. 1


210
220
110
Camera
Memory
266
DSP
230
MP
Comm
Interface
250
260
240

FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6

320

| | | |
|---|---|---|
| Account ID | XXXXXX | 321 |
| Password | PPPPPPPP | 322 |
| Account Name | ReMax NC | 323 |
| Contact Name | Joe King | 324 |
| Billing Address | 100 Atlantic Blvd<br>Suite 100<br>Charlotte, NC 27999 | 325 |
| Camera ID | yyy.yyy.yyy.yyy | 326 |
| Dial ID | zzz.zzz.zzzz | 327 |
| Active from | MMDDYY | 328 |
| Active to | MMDDYY | 329 |
| Direct/Server(D/S) | S | 330 |

FIG. 7


341
Address Book for XXXXXX@YYYY.COM
354
View: People
Groups
View by Group: ALL
352
Add New Entry
340
Full Name | Nickname | Address | Edit | Del
Tammy Baker | TB | baker1@aol.com
Jim Baker | jbob | baker@aol.com
Bill Blass | BB | bb@aol.com
John Doe | Jdoe | jdoe@aol.com
Jane Doe | Jdoe2 | Ja_doe@aol.com
Nan Regan | regan | nr2@aol.com
Jeff Smith | jeff | jsmith@aol.com
342
344
346
348
350

FIG. 8


Edit/View Address Book Entry
Save
Entry Name: Jeff Smith
First name
Jeff
Last name
Smith
Nickname
jeff
e-mail
jsmith@aol.com
Reply OK (Y/N)
N
362
e-mail2
Reply OK (Y/N)
N
364
Work Phone
919.888.8888
Home Phone
Fax Number
Mobile Phone
366
Path
Z:\images\epic\
367
Mailing Address
Address2
City
Zip
Birthday
360

FIG. 9


Address Book for XXXXXX@YYYY.COM
341
372
View:
People
Groups
Add New Entry
374
370
Group Name
Edit
Del
3br2ba
All
family
manse
376
378
380

FIG. 10



Edit Group
392
Group Name:
manse
Non-Members
Tammy Baker (baker
jim baker (baker@ao
John doe (jdoe@aol.
jane doe (ja_doe@a
Jeff Smith (jsmith@a
Add >>
<<Remove
Delete Group
Done
Group Members
Bill Blass (bb@ao
Nan Regan (nr2@
390
394
396
398
396'


FIG. 11


START
402
Packet
NO
YES
404
Register
406
Wait for Interface Signal
408
Send Last
Mark Last Msg. To Send
410
412
Get Image
414
Audio
YES
Audio
416
NO
418
Format
420
Send Mode
NO
Save MSG; Mark to Hold
422
YES
423
Save Msg; Mark to Send
424
Invoke Transmit If Inactive
426
Msg File Full
YES
Issue Warning
428
NO

FIG. 12


404
Register
432
Registered?
YES
NO
434
Register with Network
436
Contact Server
438
Receive Server Updates
Return

FIG. 13



412
Get Image
440
Signal Camera
442
Compress Image
444
Display
Return


FIG. 14



416
Audio
450
Display Prompt
452
Record Msg.
454
Play Back Message
456
Ask If Ok?
NO
YES
Return


FIG. 15


Format
460
Custom Class
YES
Custom
466
NO
461
Move Header
462
Move Recipient Code
464
Custom
NO
YES
466'
Custom
467
Move Address
468
Move Image
470
Audio
NO
YES
472
Move Audio
474
Move EOM
Return

FIG. 16


Custom
YES
Address
NO
480
Ask User to Enter Address
482
Display Address
484
Address OK?
485
NO
YES
Save As Delivery Address
486
Return
Ask to Enter Class
488
Display Class
490
Class OK?
492
NO
YES
Save As Class
494
Return

FIG. 17


500
Transmit
510
Packet?
NO
Establish Circuit to Server
512
YES
514
Point to First Message
516
Msg. On Hold?
YES
NO
518
Packet?
NO
YES
520
Transmit as IP
Transmit to Server
522
524
Delete If No Error
NO
End of Msgs
526
YES
528
Packet
NO
Close Circuit
530
YES
Return

FIG. 18




FIG. 19


542
Process
544
Receive + Save Message
546
Hold
YES
Return
NO
548
Custom
YES
Get IP Address
550
NO
552
Group or Individual
I
Format and Transmit to Recipient
554
G
Return
556
Build Recipient List
558
Format and Transmit to Each Recipient
Return

FIG. 20


570
Update
572
Receive Query From Camera
574
Any Changes ?
NO
Return
576
Resolve Addresses
578
Transmit Data to Camera
580
Save Download Date
Return

FIG. 21


586
Reply
588
Receive Message Reply
590
Account Valid
NO
Respond "Account Invalid" "Try Elsewhere"
Return
YES
594
Reply Forwarding OK
NO
YES
596
Reformat + Transmit to Camera
598
Archive Reply for X Days
Return

FIG. 22

# APPARATUS AND SYSTEM FOR PROMPT DIGITAL PHOTO DELIVERY AND ARCHIVAL

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application number 60/087,745 filed on Jun. 2, 1998.

## FIELD OF THE INVENTION

The present invention relates to digital cameras and particularly to digital cameras which include a radio frequency (RF) transceiver for transmitting digital photos to a remote destination according to user preferences.

## BACKGROUND OF THE INVENTION

Digital cameras are increasingly popular, which popularity is due in part to their elimination of processing delays involved with conventional film-based photography. With a digital camera, one does not have to shoot an entire roll of film and send it to a processor for development before seeing the resulting photograph. Instead, one cam immediately download a digital image to a computer and display the photograph, or in some instances link the digital camera to a TV monitor to display the photograph. Another attractive feature of digital cameras is that the digital images they create, after being stored on a computer, can be forwarded to others via e-mail or can be incorporated into other electronic documents, including Internet web pages.

However, the process of connecting the digital camera to a computer and then downloading images to the computer for storage and viewing can be complicated. Some digital camera manufacturers have attempted to make this process easier by including in the camera a standard format 3.5 inch floppy disk drive for storing digital images so that the images can be easily accessed by computers with similar disk drives. Others provide flash card memory which can store a high number of images, or provide an infrared (IR) port for transferring images to a computer.

Even with these features, the image transfer cannot be begun until the digital camera (or storage device) is physically connected to a computer, or in the case of digital cameras and computers which include IR transceivers these must be located in close proximity before a transfer can be made. For many users, this process is confusing and detracts from the usefulness of the device. When a user wishes to view or share access to a digital photo quickly, this delay and manual transfer process can be both inconvenient and frustrating.

Another potential problem with current digital cameras is that they generally require creation of a database of images on a home or office computer, which often has limited accessibility, is unsecured, and is infrequently backed up. With the growing popularity of Internet accessible software programs, and "network computers" which include little or no data storage, there is a need for a networked image storage and archival service which provides secure, reliable, and universally accessible image storage services. Such a service would allow shared access to and transfer of images by family or business groups in a format which would greatly enhance the ability to categorize and sort each image by time, date, and occasion, and which would at the same time greatly reduce the possibility of losing important images. The Fujifilm company is known to offer an Internet



archival service in connection with conventional film processing, but there is no known similar service for digital photos.

When compressed, a color digital image is typically 10K bytes or more in size, and transmission of such an image requires from 10 to more than 30 seconds, depending on wireless modem transmission rates. Cellular service providers typically charge for total circuit connection time or, in the case of wireless data services providers, for the amount of data transferred, and it is therefore advantageous to reduce the required connection time to perform a file transfer or the amount of data to be transferred. One way to do this is to compress the file before transmission. But even when a file is to be sent to multiple recipients one would not want to initiate multiple calls in order to transfer the file to each recipient, even if the file is compressed. It would be beneficial to have a system which allowed one to forward an image file, with distribution instructions, to a central repository, and known that the repository would then save and/or automatically distribute the image file according to prior user instructions, without incurring another expensive wireless transfer.

Digital cameras which include the ability to effect a wireless RF image transfer are not known to be currently marketed in the United States. A search of issued U.S. Patents has revealed U.S. Pat. No. 4,884,132 to Morris et al, which provides a "personal security unit" which includes a digital image sensor, a cellular transmitter, a window aligned with the image sensor, and which transmits digital information identifying the hand-held unit to a remote cellular receiving station where all cellular communications received from the personal security units are recorded. Morris states that the recorded data can be accessed at a later time if a crime is reported.

Another known device is disclosed in U.S. Pat. No. 5,712,679 to Coles which discloses a security system with a method for locatable portable electronic camera image transmission to a remote receiver. This device provides the means to transmit a video image along with device identifying information and position coordinate information to a remote receiver. Coles states that the transmission may be accomplished by cellular radio and is received by a remote receiver where the image may be displayed or printed by facsimile.

## SUMMARY OF THE INVENTION

The present invention comprises a wireless digital camera device (also referred to herein as a wireless device) including a processor, RF communications device (modem), memory, and digital cameras which is configured to transmit a digital data message, including at least a digital image, an account ID, and a recipient code, across a combined wireless and wired network to a host system at a predefined Internet Protocol (IP) address. The portable apparatus is programmed to minimize the number of user inputs required for operation in order to operate much like other automatic cameras, providing "aim and shoot" operation. While it is presently possible to assemble a portable device which can transfer data files, including image files, to a destination computer by using readily available commercial products, such as a portable computer, camera, and cellular modem, such a system requires user input to configure and initialize, including a destination phone number for modem dialing or a host IP or e-mail address to send the image to. The present invention provides a simple wireless photo delivery system which requires minimal user inputs for successful configuration and operation.

In order to simplify the wireless camera apparatus set up and operation, the present invention provides a user-friendly means to customize operational features of the camera. Many computer users today have access to web sites on the Internet, and are familiar with the process of interacting with programs and forms posted on Internet web sites. In one embodiment of the present invention, a digital camera service server provides a means for users to define distribution nicknames and custom operation options, and automatically downloads these custom operational parameters to the wireless camera whenever they are updated.

In order for an e-mail system to resolve e-mail addresses into IP addresses it is necessary for a user device to have access to a domain name server (DNS) resolver. This exchange of messages between the remote device and the DNS at time of message delivery is eliminated in one embodiment of the present invention by having e-mail addresses resolved into their corresponding IP addresses by the digital camera service server (subsequently referred to herein as the server) prior to downloading these IP addresses with address nicknames to the wireless camera device. This enables embodiments of the wireless camera device which contain a wireless packet data communications device such as a Cellular Digital Packet Data (CDPD) modem to construct and send messages directly to the Internet recipient's known IP address in a protocol format known to those of ordinary skill in the art, such as TCP, Simple Mail Transfer Protocol (SMTP), Internet Message Access Protocol (IMAP), Multipurpose Internet Mail Extensions (MIME), Serial Line Internet Protocol (SLIP), Point to Point (PPP), or Post Office Protocol (POP) without reference to a DNS resolver.

Wireless device users may wish to maintain control over who can send messages to them, in order to avoid paying for unwanted message transmissions. Another aspect of the present invention allows messages generated by the wireless device to be formatted so that the message origin address appears as a server address. This causes all message replies to be routed to the server, which receives and filters all replies addressed to the wireless device and only forwards messages which are from approved sources and in appropriate formats to the wireless device.

There is then a need to provide an apparatus and system which will allow for effortless transfer of a message including a digital image, an account identifier, and an optional recipient code, across a combined wireless/wired network to a host device at a pre-defined IP address. One aspect of the invention provides a digital camera service server host device at the pre-defined IP address which can store portions of the message, and/or forward select portions of the message and digital image to one or more recipients associated with a message recipient code.

In the case where the delivery IP address corresponds to a server, the data message may be stored at the server for later access or may be immediately forwarded to one or more IP addresses that corresponds to a recipient code included in the data message. When an image is to be sent to multiple recipients, it is much more economical to only incur one transmission from the wireless camera device across the wireless communications link to the server, and then forwarded the image to each intended recipient through a conventional wire-line or fiber optic network.

In one embodiment of the present invention, an account is established on the server which corresponds to at least one wireless camera device. This server may be a private system accessible only via a private network, or may be connected to the Internet and be configured to allow wireless device users to access the server by using commonly available world wide web browsers. In either case the server is preferably remotely accessible in order to establish or update account parameters, or to access previously transmitted digital images and or responses thereto. In the preferred system, each server account is password protected for access only by authorized users. Authorized users may update their server accounts to establish recipient codes, or nicknames, and associate these codes with one or more destination e-mail addresses, IP addresses, phone numbers (for delivery of audio messages), or storage destinations (such as a server path name), thereby creating nicknames for the purpose of controlling how messages will be archived and/or distributed to individuals or groups.



When certain account parameters, such as nicknames, are changed on the server, they are automatically flagged to be downloaded in a list to the wireless camera device the next time the wireless device contacts the server. Alternately, the wireless device may be programmed to get a fresh copy of account parameters, or portions thereof, upon each new connection to the server. This nickname list is viewable in a scrollable window on the wireless camera device, providing a quick means for selecting who a particular data message is to be sent to, without concern for entering an e-mail or IP address.

For example, a camera used who is employed as a Realtor may define both business nicknames and personal nicknames. Business nicknames may include codes based on property attributes (a 3BR2BA code for all customers who are currently looking for a house with at least three bedrooms and two baths) or may include codes for different communities or property price ranges. Finance companies could also use the wireless camera to automatically create a photo of the collateral property, as required in many states, and simultaneously send the photo to the loan processor and to an archive file.

Other potential uses for the invention include (i) photo-advertisements—for example, camera can be used by sales agents to send pictures to a list of current clients, to an office webmaster, print shops, etc., or to save photos in a pre-defined server directory; (ii) jorunalists could use the system to submit late breaking news pictures; (iii) insurance adjusters—photo with claim or file numbers can be mailed directly to the home office or saved in a pre-defined server directory associated with the file; (iv) police—photos of accident site/crime scene can be captured and archived; and (v) a holiday photo system where the camera can be rented while on vacation in order to have photos automatically e-mailed to a printing service, or to a list of friends/relatives with whom you want to share trip events.

In the preferred embodiment, the invention comprises a battery powered wireless camera device, including a digital camera for creating a digital image, a memory for storing digital images, a delivery IP address, and a list of nicknames, an RF communications device connected to the wireless device, and processor means for transmitting a message to the delivery IP address via the communications device. Backup memory in the form of a removable disk or memory card may be provided in some embodiments for message storage with or without message transmission. The message includes an account ID, a recipient code (nickname), and at least one digital image created by the digital camera. As further described in the Detailed Description section of this disclosure, in some embodiments, the message may include message origination date, time, a message classification indicator, digital audio recordings, and/or location coordinates, and in some instances may not include a digital image.

The delivery IP address may be saved in the wireless camera device memory in response to input commands entered at a device user interface, input commands entered remotely via the communications device, or input commands during manufacture of the wireless device. The RF communications device may be a circuit-switched data modem or packet data modem, and may respectively establish a switched connection through the Public Switched Telephone Network (PSTN) to the server or to a host device and router system at a particular phone number from which messages are transmitted to the destination IP address, or may transmit the message directly through a cellular service provider digital packet network connection, such as CDPD, to the destination IP address through an Internet connection.

In alternate embodiments, the wireless camera includes a microphone interface for recording audio messages to be transmitted in a digital format with messages. In such embodiments where the interface includes a microphone, a voice recognition module may be used to translate spoken messages into operational commands. For example, the wireless apparatus may be activated to record a spoken nickname, address, or alphanumeric identifier for association with the message, process this recording with the voice recognition module, and then include the character output of the voice recognition module as a nickname, e-mail address, classification or message field in the next message transmission. Other interface means may include a bar code scanner, or numeric or alphanumeric keypad.

Another embodiment is configured to function as an enhanced digital phone that includes a digital camera. Other embodiments include an optional global positioning system (GPS) unit for capturing location data that may then be included in the message. Yet another embodiment of the invention includes a data port which is connected directly to the communications device so that the wireless camera device can be used as a portable RF modem for external devices which are connected to the data port from time to time.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high level diagram of the photo delivery system of the present invention.

FIG. **2** is a block diagram of the wireless device.

FIG. **3** shows a representative user configuration table for the wireless device.

FIG. **4** shows a representative recipient selection view of the wireless device interface means.

FIG. **5** shows a representative mode selection view of the wireless device interface means.

FIG. **6** shows a representative classification selection view of the wireless device interface means.

FIG. **7** shows a representative account configuration record on the server of the present invention.

FIG. **8** shows a server interface means display of account recipient information.

FIG. **9** shows a server interface means display of representative individual recipient information.

FIG. **10** shows a server interface means display of representative group information.

FIG. **11** shows a server interface means display for editing representative group information.

FIG. **12** shows a process flow chart for one embodiment of the wireless camera device of the present invention.

FIG. **13** shows a process flow chart of the register process of FIG. **12**.



FIG. **14** shows a process flow chart of the get image process of FIG. **12**.

FIG. **15** shows a process flow chart of the audio recording process of FIG. **12**.

FIG. **16** shows a process flow chart of the format process of FIG. **12**.

FIG. **17** shows a process flow chart of the custom input process of FIG. **16**.

FIG. **18** shows a process flow chart of the transmit process of the preferred embodiment wireless camera device.

FIG. **19** shows a data format for data transmitted from the wireless camera device to the server of the preferred embodiment.

FIG. **20** shows a process flow chart of how the server processes messages received from a wireless camera device.

FIG. **21** shows a process flow chart for how the server responds to wireless camera device queries.

FIG. **22** shows a process flow chart for how the server responds to messages addressed to a wireless camera device.

## DETAILED DESCRIPTION

As will be understood from reading and understanding the following more detailed description, the present invention includes a wireless digital camera apparatus, and in the preferred embodiment includes the digital camera apparatus as part of a digital photo delivery system, which system also includes a server that is accessible through the Internet for user updates. Each user of such system has an assigned server account ID and password which is required in order to update account parameters and access messages stored on the server although in some embodiments user may designate that certain images may be stored in a public area from which they may be freely accessed or linked to. This photo delivery system **100** is shown in FIG. **1** as including a wireless camera apparatus **110**, which transmits and receives messages via a radio network **120**. The radio network **120** can be any data-capable airlink (such as GSM, TDMA, CDMA), or wireless data network such as CDPD, or may be a short range radio link such as an in-building network or a radio link between the wireless device and other devices via a standard protocol such as the Bluetooth Specification sponsored by Ericsson, IBM, Intel, Nokia, and Toshiba, The radio network **120** is connected to an external network **130**, which may be the Internet, an intranet, or other private data network. The external network **130** is connected to at least one wireless camera service server **140**, and one or more viewer stations **150** (which will ordinarily comprise a personal computer and may be configured to include a viewer microphone **160** or a viewer camera **170**). In alternate embodiments the external network is connected to a printing service **180**.

Major elements of the wireless camera apparatus **110** are shown in block form in FIG. **2**, as including a digital camera **210**, a memory **220**, a processor **230**, a RF modem **240** which includes an antenna **250**, interface means **260**, and digital signal processor **266**, which in the preferred embodiment are integrated into one unit. However, the wireless camera device **110** and the server **140** may be programmatically implemented by using many general purpose hardware components. For example, the wireless device **110** may be implemented with a handheld PC such as the Mobile HC 4100 connected to a CE-AG04 color digital camera card, both available from Sharp Electronics Corporation, and a wireless CDPD modem such as the Sage modem available from Novatel Wireless, Inc. Alternately, the wireless device may be implemented by programming a Novatel Wireless

CONTACT handheld PC (which includes an integrated CDPD modem), now available for beta testing from Novatel, and which is connected to any one of several digital cameras presently available on the market. The invention may also be programmatically implemented on a combination of notebook computer running the Windows 95 operating system, wireless CDPD modem such as the PM100C CDPD modem from Motorola, and digital camera, such as the QuickCam VC from Connectix Corporation or the CMOS-PRO from Sound Vision Incorporated, or the Sony Vaio C1 Picturebook computer that incorporates a digital camera, and a CDPD PC card modem such as the Sierra Wireless Aircard.

Although the RF modem for the preferred embodiment is configured for packet data transmissions, circuit switched modems may be used without departing from the spirit of the invention. For example, alternate embodiments may include a combined CDPD and circuit switched modem, such as the Sierra Wireless SB220 OEM communications module, in order to allow wireless communication via a circuit switched connection to the server **140** when the wireless device is used in an area where CDPD service is not available.

FIG. **3** shows a representative configuration table **310** for the wireless device which in the preferred embodiment system is built on the server **140** and stored in server memory, and downloaded to the wireless device memory **220** after each change to table contents, or upon initial activation of the wireless device **110**, although for wireless device embodiments with interface means **260** which provide the ability to input alphanumeric text, the configuration table **310** or portions of it can be modified directly on the wireless device **110**. In FIG. **3** the items in recipient code column **312** are nicknames which may be selected by users of the wireless device **110** in order to control distribution of messages transmitted from the wireless device. Optional recipient type column **314** represents an indication of whether the nickname designates a group nickname (G) an individual nickname (N) or a system processing code (S). Two system processing codes CUSTOM and HOLD are shown. HOLD is the default nickname which is used if no other nickname is selected. When the apparatus is activated to send a photo with HOLD, a message is constructed and sent to the server **140** where it is held for predetermined period of time to await further processing instructions. When the wireless device **110** is activated to send a photo with CUSTOM, a process is activated on the wireless device **110** to allow the user to designate a custom e-mail address prior to transmitting the photo message to the server. Recipient IP address column **316** corresponds to IP address data which is generated by the server **104** before downloading the table to the wireless device **110**, and which is applicable only when the nickname is for an individual. Although not shown here, the preferred embodiment configuration table **310** also includes a list of message classifications as further described in reference to FIG. **6** below, as well as other custom parameters used to control operation of the wireless device **110**.

FIGS. **4**–**6** show a portion of the preferred embodiment wireless device interface means **260** as including a configuration display **198**, mode display **200**, vertical scroll key **190**, horizontal scroll key **192**, and select key **194**. As will be apparent to one skilled in the art, the configuration display **198** and mode display **200** may be comprised of an active matrix display, LCD display, or other appropriate display means. In other embodiments the scroll keys **190** and **192**, and select key **194**, may be incorporated into a touch screen display.



Mode display **200** of the preferred embodiment includes three possible operation modes, “TO”, “MODE”, and “CLASS”, which are selected by the horizontal scroll key **192**, and the currently selected operation mode is highlighted. When the TO mode is selected, the preferred embodiment configuration display **198** shows up to four recipient codes and their corresponding recipient types from the current configuration table **310**. In FIG. **4**, three group nicknames and one individual nickname are displayed, with the current selection (“FAMILY”) being highlighted. Nickname selection in the preferred embodiment is controlled by the vertical scroll key **190**.

FIG. **5** shows that when the MODE operation mode view is selected on mode display **200** the configuration display **198** shows a list of current operation modes for that embodiment of the wireless device. The display shown is for an embodiment which allows operation in a “SEND”, “SAVE”, and “SEND LAST” mode. For illustration purposes, the preferred embodiment, which allows the capability to record an audio message for transmission along with a digital photo image, would have operational modes of “SEND”, “SEND W/AUDIO”, “SAVE”, “SAVE W/AUDIO”, “SEND LAST” and “AUDIO ONLY”, corresponding respectively to transmitting an image without an audio message, transmitting an image with an audio message, saving an image without transmitting it, saving an image and an audio message without transmitting, transmitting the last saved message, and transmitting only an audio message.

FIG. **6** shows that when the CLASS operation mode is selected on mode display **200** the configuration display **198** shows a list of current message classifications, which may be selected by operation of vertical scroll key **190**. When the wireless device **110** is activated to send a message with the CUSTOM classification selected, a process is activated on the wireless device **110** to allow the user to designate a custom message classification, such as a customer number or name, prior to transmitting the photo message to the server **140**. Various message classifications may be customized on the server **140** of the preferred embodiment and downloads to the wireless device **110** along with other portions of the configuration table **310** as will be later described in relation to FIG. **13**.

FIG. **7** shows a representative account configuration record on the server **140** of the present invention. In the preferred embodiment wireless photo delivery system each wireless device user will have an account configuration record on the server which includes an account ID **321**, a password **322**, an account name **323**, a contact name **324**, a billing address **325**, a camera id **326** which corresponds to the RF modem **240** network equipment identifier or IP address (for those devices with a packet data modem), a wireless device dial ID number **327** corresponding to the phone number associated with the RF modem **240** (for those devices with a standard circuit switched cellular modem), and data fields **328** and **329** corresponding to the dates for which account service has bene established. Other embodiments include a Direct or Server switch field **330** which is used to indicate whether wireless device messages to individual nicknames will be transmitted first to server for distribution or directly to the nicknames associated IP address. In such embodiments, only messages which are transmitted to the server can be archived.

FIGS. **8**–**11** depict server interface means display in the preferred embodiment for establishing and maintaining account recipient information which are preferably accessible via any Internet browser program, and which are stored in server database tables, along with the FIG. **7** account

configuration record, in any number of ways which will be apparent to those who are skilled in the relevant art using standard techniques such as active server pages accessing a relational database. FIG. **8** shows a people or individual address screen **340** view of all account message recipients in column **342**, associated nicknames in column **344**, associated e-mail addresses in column **346**, and edit the delete selector buttons in columns **348** and **350**. Other user selection buttons in this screen view are a drop down list view selector **352** and a group view selector button **354**. The top of this display shows the account e-mail address **341** which is associated with this server account. This address **341** in the preferred embodiment is comprised of the Account ID (represented here as XXXXXX), and the server domain name (represented here as YYYY.COM). In one embodiment, any e-mail messages which are received by the server for this e-mail address in an acceptable format from authorized e-mail addresses (as further described below) will be forwarded to the associated wireless device.

FIG. **9** shows a server interface means display address book detail screen **360** of representative individual recipient information, corresponding to the last address book entry shown in FIG. **8**, and indicating the allowed level of detailed information which is stored on the server **140** for each account individual recipient record in the preferred embodiment. Most of these fields are self describing, but e-mail type OK indicators **362** and **364** are used by one embodiment server to build an account table of all e-mail addresses where this indicator is set to Y. This table is checked when the server receives e-mail addressed to the account e-mail address, and if the sender's e-mail address is found in the table then the e-mail will be forwarded in an appropriate format to the wireless device. Phone numbers **366** are optional, but are included for embodiments which are capable of forwarding wireless device messages which include an audio portion to a telephone or voice mail number, which can be accomplished in many ways apparent to those skilled in the relevant art. Path **367** is optional and is included for embodiments where the message is to be saved under a specific server directory path in lieu of or in addition to being distributed.

FIG. **10** shows a server **140** interface means group view display **370** of representative group information which is accessed in the preferred embodiment by selecting the group view selector button **354** shown in FIG. **8**. This group view display **370** shows currently defined account groups and include a people view selector button **372**, an add new entry selector button **374**, a group names display column **376**, an edit selector button column **378** for each group name, and a delete selector button column **380**. Selection of people view button **372** will take you back to the view of FIG. **8**, and selection of add new entry selected button **374** or any edit selector button in column **378** will take you to the group detail view of FIG. **11**.

Server **140** interface means group detail view display **390** for editing representative group information in the preferred embodiment is shown in FIG. **11**. This particular group detail view shows hypothetical entries for a group name "MANSE" in group name selector field **392**. When the detail view **390** is activated by the add new entry selector button **374** of FIG. **10**, the group name selector field would be blank, and all defined individuals would be displayed in non-member display column **394**. The preferred group detail view **390** includes vertical scroll bars **396** and **396'** and a group member display column **398**. Other users selectable buttons on the preferred group detail view include add, remove, delete, and done buttons, which operate respectively to add highlighted non members shown in column **394** to the group, to remove highlighted members shown in column **398** from the group, to delete the entire group, or to return to the group view display **370** of FIG. **10** after processing any changes.

FIG. **12** shows the overall method used to operate one embodiment of the wireless camera device of the present invention which includes both switched circuit cellular and wireless packet data modem capabilities. The process begins at block **402** where a flag is checked to determine whether the wireless packet data modem is to be used. If so, processing continues with the registration process of block **404**, which is shown in further detail in FIG. **13**. In the alternative the registration process is skipped and (although now shown here) wireless devices with circuit switched modems may contact the server **140** to obtain a fresh configuration table **310** before processing continues at block **406**, where processing halts until a signal is received indicating the send key **196** has been activated. At block **408** the operation mode is checked, and if the SEND LAST switch is set processing branches to block **410** where the first previously held message is marked to be sent, after which processing returns to a wait state at block **406**. If the send last flag is not set, the operation mode is not AUDIBLE ONLY, the GET IMAGE routine of FIG. **14** is activated at block **412**. If at block **414** the AUDIO ONLY, SAVE W/AUDIO, or SEND W/AUDIO operation mode is set, the AUDIO routine of FIG. **15** is activated at block **416** before activating the FORMAT routine of FIG. **16** at block **418**. If at block **420** the operation mode is set to SAVE or SAVE W/AUDIO processing branches to block **422** where the formatted message is saved in memory **220** and marked to be held in the wireless device memory, but if the operation mode is not set to save the message, then at block **423** the message is saved in memory **220** and marked to be sent as soon as possible, and at block **424** the Transmit function of FIG. **18** is invoked, if this is not already active. In either case processing continues at block **426** where if memory is full, a warning is issued to the operator via the user interface means **260** which, in those embodiments that have flash memory or other removable memory devices, would prompt the user to replace memory device **220**, before branching back to the beginning of the method at block **400**. While this describes the best mode embodiment process, it will be apparent to those skilled in the art that many steps may be executed in an altered order or may be otherwise modified without departing from the scope of the invention as claimed herein.

FIG. **13** shows a process flow chart of the registration process of FIG. **12** which is activated in the preferred embodiment as well as any other embodiments which include a wireless packet data modem. Once registered with a wireless packet data service provider network, wireless packet data modems can remain registered for an indefinite period of time and most such modems, including the wireless packet data modem of the preferred embodiment, periodically query the network to verify that the device is still registered and set an indicator if the registration is dropped. In most instances, this FIG. **13** routine will execute only once upon powering up the wireless device **110**, and thereafter the indicator check at block **432** will branch to return back to the calling routine of FIG. **12**. In case the wireless device is not registered with the network, a registration routine on the RF modem **240** will be initiated to register with the network at block **434**. Next, at block **436** a query will be transmitted to the server **140** indicating that the device is registered, and requesting the server to transmit a

copy of the configuration table **310** if this has been updated since the last time the wireless device was used. Finally, at step **438** the wireless device will receive and save any configuration table updates received from the server. In alternate embodiments, the wireless device **110** may simply log in to the server and retrieve its associated configuration table **310** in a manner well known in the art.

FIG. **14** shows a process flow chart of the get image process routine which is activated from block **412** of the preferred embodiment main process of FIG. **12**. This process initially signals the digital camera **210** to save a digital image at block **440**, may then compresses this image in memory **220** according to a standard compression scheme such as GIF or JPEG at block **442**, and for embodiments with a interface means **260** which includes a display capable of showing a reduced version of the image, display the image at block **444**. Other embodiments may alternately be configured to constantly display the image currently being received by the digital camera **210**, or in very simple embodiments may be configured only with a viewfinder and have no interface means **260** capable of displaying any image. Still other embodiments may skip the compression stage as it is recognized that larger files generally are more detailed and desirable, and compression to a small size prior to transmission may be less important in the future as greater wireless bandwidth becomes available.

FIG. **15** shows a process flow chart of the audio recording process of FIG. **12** as including a first processing step **450** which displays or plays a visual or audible prompt asking the wireless device user to record a voice message. Wireless devices which are equipped to allow audible messages recording, including the preferred embodiment, have an interface means **260** which includes a record button which must be depressed and held while a message is recorded at block **452**. Otherwise the record function could be automatically activated for a set period of time at block **452**. After the recording ceases, the message is played back at block **454**, and the user is asked at block **456** if the message is acceptable. If the user indicates the message is acceptable, the audio process ends, and if the message is not acceptable processing branches back to block **450** to repeat the message recording process.

FIG. **16** shows a process flow chart of the preferred embodiment message format process **418** of FIG. **12** as including a first check **460** to determine whether the operation mode is set to include a custom classification. If so, the custom input process is invoked at a first entry block **466** with a parameter indicating that a custom classification is requested, before processing continues at block **461** where the message header is constructed in a buffer area of memory **220**. This message header **534**, as shown in more detail in FIG. **19**, includes such data as the account ID, Classification, date, time, and location coordinates if available. At block **462** the currently designated recipient code **536** is moved in to the buffer area. At block **464** a check is performed to determine whether a custom recipient code/e-mail address was requested. If so, the custom input process is invoked at a second entry block **466'** with a parameter indicating that a custom address is requested, after which the custom address is moved into the buffer area at block **467**. Otherwise, processing continues at block **468** where the image is moved into the buffer area. Then at block **470** a check is performed to determine whether the AUDIO ONLY, SAVE W/AUDIO, or SEND W/AUDIO operation mode is set, indicating that an audio message was recorded. If so, the audio message is moved into the buffer area at block **472**. Otherwise, processing continues at block **474** when an end of message



indicator is moved into the buffer area. Throughout this process appropriate delimiters will be added to indicate message field boundaries, and a current message length field updated appropriately, in a manner which is well known in the art.

In other embodiments, the messages may be formatted by the wireless device **110**, and account ID and recipient code transmitted to the server, by a different mechanism without departing from the spirit of the invention. For example, an image file may be assigned a unique file name, including the account ID, recipient code, and an image identifier, for later transfer via FTP Put command to the server **140**. Similarly, audio messages could be sent separately to the server **140** under a corresponding file name for later association with the image file by a process on the server.

FIG. **17** shows a process flow chart of the preferred embodiment custom input process **466** and **466'** of FIG. **16**, wherein at block **480** a check is performed to determine whether the routine was activated to provide a custom address or a custom classification. If for a custom address, the user is prompted by the interface means **260** displays or by audio prompt to enter the recipient's e-mail address. The address is entered via the user interface means **260**, via a microphone and voice recognition module on certain embodiments or via other input means such as selections from a scrollable list of alpha numeric characters, or via keyboard input. The address is displayed at block **484** and the user is asked to verify this at block **485**. If the address displayed is incorrect, processing branches back to block **482**, and, if correct, processing continues at block **486** where the custom address is saved in memory. If the custom input routine of FIG. **17** is entered to provide a custom message classification, then a similar process is executed at blocks **484** through **494** whereby a custom classification is entered and saved in a designated area of memory **220**.

In the preferred embodiment a separate processing loop, as shown in FIG. **18**, is invoked to transmit messages from them wireless device to the server. This allows users to quickly take several pictures without waiting for the prior picture to be transmitted. A standard wireless packet data routine is utilized to receive messages by the RF modem **240** in a manner well known to those of ordinary skill in the art and is not further described here. As previously described in relation to FIG. **12**, the transmit process is invoked (if it is not already active) after a message has been formatted in memory **220** for transmission. Upon activation an indicator on the wireless device is checked to determine whether the transmission is to be accomplished as packet data or as circuit switched data. This indicator may e set ton only allow packet or circuit data transmissions, or may be set dynamically in embodiments which include the capability to transmit both as packet data or circuit data depending on the availability of a packet data network, so that one form of transmission may be established as preferred, but if that form is not available, then the other form of transmission will be attempted.

If as a circuit switched data, block **512** process is invoked to establish a switched circuit modem connection between the wireless device and either the server **140** or a known host which is capable of transmitting the message according to an IP protocol to a defined destination IP address. Formatted messages are stored in memory **220** until transmission is complete, and at block **514** a pointer is established to the first message in queue in memory. At block **516** the message is checked to determine whether the message is on hold, or is marked to be sent, and if marked to be held processing branches to block **526**. If not held, a second check regarding

packet data is performed at block **518**, and if the wireless device **110** is set for packet data transmissions a routine at block **520** formats the message for transmission, preferably by the TCP/IP protocol, or by other IP protocols which are well known to those of ordinary skill in the art of packet data transmissions, and activates the RF Modem, which in some embodiments may be preconfigured to transmit the message according to a particular protocol.

If the wireless device **110** is not set for packet data transmissions, then the message is transmitted to the server **140** or a known host which is capable of forwarding the message according to an IP protocol to the server. This is preferably accomplished as an asynchronous data transmission in compressed form, such as the V.42bis compression protocol in order to reduce transmission time.

Regardless of the type of transmission, after the transmission is attempted in the preferred embodiment, common processing continues at block **524**, and if no error flag was set during transmission, the transmitted message is deleted from memory. However, in other embodiments, the user may wish to maintain a copy of the message after transmission, for back up or other purposes, in which case the message may be marked to be held instead of being deleted at this point. At block **526** the next message slot in the memory queue is pointed to and if another message is in the memory queue processing continues back at block **516**. Otherwise, a final check is performed at block **528** to see if a circuit switched data transmission is being used, and if so, the circuit is terminated at block **530**.

In addition to the processing routines which drive the server interfaces of FIGS. **7** through **11** and the database calls which are required to support these interfaces, the preferred embodiment server **140** includes a several specific processes related to message transmissions both from and to wireless camera device **110**, and which are shown in FIGS. **20** through **22**. FIG. **20** shows a process flow chart of how the server processes messages received from a wireless camera device. At block **544** the server receives a message, parses out information such as account number, image, audio data, date, time, classification, location, and recipient code which is included in the message, saves this in a server memory for future access and in a holding area designated for this account, and if a path is associated with the recipient code saves the message at that location. At block **546** the server determines whether the message is to be held or if the account is no longer valid, in which case no further action is taken, and the message will be marked for deletion after a predetermined period of time absent further action. At block **548**, if a custom address was included in the message, then processing branches to block **550**, where the address may be resolved into an IP address before being formatted as a standard e-mail message and transmitted to the recipient or this may be handled automatically by a commercially available e-mail program such as MS Outlook, depending on how the server is configured. Otherwise, if the message is to an individual then processing continues directly at block **554**. If the message is to a group, then a list of recipient addresses is retrieved at block **556**, and at block **558** the message is formatted as a standard e-mail message and transmitted to each recipient. Some embodiments may only send out a thumbnail version of images and/or a hyperlink to the server path or URL where the message has been saved.

Certain embodiments may allow delivery of the audio portion of messages to a recipient's phone number, in which case a separate server process would be invoked to make a set number of attempts to deliver the message to the listed phone number or a voice mail system at that number, after which the message would be marked undelivered. If the message recipient wished, they could leave a reply message immediately, via an interactive voice process on the server, which reply the server would later attempt to deliver, or the recipient could call back later to a designated number and enter a response ID number, both as specified with the original message delivery, in order to leave a reply message.



FIG. **21** shows a process flow chart for how the preferred embodiment server **140** responds to queries from the wireless camera device **110** in order to download the current account configuration table to the wireless device. At block **572** the server receives a query from the wireless device as previously discussed in relation to FIG. **13**. If there have been any changes to the account since that last download, then processing continues from block **574** to block **576** where the server contacts a domain server in order to resolve all individual IP addresses for e-mail addresses associated with account individual's e-mail addresses. At block **578** the updated configuration table is transmitted to the camera in a prescribed format, and the last download data is updated for the account. In other embodiments of the wireless device **110** may simply log into the server **140** upon initial activation of the wireless device and registration with the wireless packet data network and retrieve its associated configuration table, as by an FTP Get command.

FIG. **22** shows a process flow chart for how the server responds to messages received by the server **140** and addressed to an address associated with a wireless camera device **110**. The message is typically received at block **288** as an e-mail message, but as previously discussed may comprise a voice mail message. If the account is valid, then processing will continue at block **594**; otherwise the server will attempt to respond that the account is no longer valid. As discussed previously in relation to FIG. **9**, the account data is checked at block **594** to determine whether a reply from this source is authorized. If a reply is authorized, the message is reformatted in a form which will be recognized by the wireless device, and transmitted to the camera ID at block **596**. In either case, in the preferred system the reply is archived for a predetermined number of days before being deleted, and will be accessible for review prior to deletion via Internet account access or via other means, such as for example embodiments where the server **140** and wireless device **110** are configured respectively as server and client using the IMP protocol as previously discussed.

Use and operation of the preferred embodiment of the present invention may be better understood by reference to the figures in connection with the following description. The wireless device user will obtain a wireless device **110** and register it with a wireless packet data network service provider, who will assign a camera id **326**, or dial id **327**, account validity dates **328** and **329**, initialize the RF modem to recognize the appropriate id, and arrange for initialization of the account information **320** (FIG. **7**) on the server **140**. The user will then be able to logon to the server and initialize preferred address book entry details as shown in FIGS. **8**–**11**, or this information may be provided directly to a service provider who will initialize the address book on behalf of the user. Alternately, and in cases where the user does no own a wireless device but only rents one on occasion, the user may establish an account and initialize address book details at his or her convenience prior to obtaining a wireless device, and the wireless device provider will associate a particular device with this account information when the user picks up the device. Next, the user can activate the wireless device **110**, which will automatically initiate the process of FIG. **12** to register the wireless device with the

packet data network and download updates as previously described in relation to FIGS. **13** and **21**. After the configuration table is initialized on the wireless device, the user will be able to operate the wireless device **110** interface in order to select a recipient code, mode, and classification, as described in relation to FIGS. **4**–**6**. If this step is skipped, the default values for any transmitted messages will be respectively set for HOLD, SEND, and NONE. The user will then be able to activate the camera by pressing the send key **196**, which will activate processing of FIG. **12** subsequent to block **406** in order to capture an image and transmit it as part of a message to the server **140** for processing and distribution according to the selected recipient code as described in relation to FIG. **20**.

Whereas the present invention has been described in detail with specific reference to particular embodiments thereof, it will be understood that variations and modifications can be effected within the spirit and scope of the present invention as hereinbefore described and as defined in the appended claims.

The invention claimed is:

**1**. Digital photo processing system comprising:

at least one wireless digital camera apparatus, wherein each said apparatus includes a processor, a memory, and a destination address and one or more previously defined recipient codes stored in said memory; user interface connected to said processor for at least displaying one or more said recipient codes and receiving signals indicating user selection of a displayed recipient code; a digital camera connected to said processor for capturing one or more digital images in response to signals from said user interface; a RF communications device connected to said processor; and processor control means, responsive to signals received from said user interface, for transmitting a message, including at least said selected recipient code and one of said digital image, to said destination address via said RF communications device; and

a server associated with said destination address and responsive to messages received at said destination address from each said wireless digital camera apparatus; server memory storing account configuration data including recipient code data; server communications means; and server control means for parsing said recipient code from each said message and processing each said message according to said account configuration data associated with said recipient code, and for transmitting account configuration data including at least one recipient code to at least one said wireless digital camera apparatus; and



wherein said processor control means of each said wireless digital camera apparatus is responsive to receiving account configuration data transmitted from said server to update said memory of said wireless digital camera apparatus with at least a portion of said account configuration data.

**2**. Digital photo processing system comprising:

at least one wireless digital camera apparatus, wherein each said apparatus includes a processor, a memory, and a destination address and one or more previously defined recipient codes stored in said memory; user interface connected to said processor for at least displaying one or more said recipient codes and receiving signals indicating user selection of a displayed recipient code; a digital camera connected to said processor for capturing one or more digital images in response to signals from said user interface; a RF communications device connected to said processor; and processor control means, responsive to signals received from said user interface, for transmitting a message, including at least said selected recipient code and one said digital image, to said destination address via said RF communications device; and

a server associated with said destination address and responsive to messages received at said destination address from each said wireless digital camera apparatus; a database storing account configuration data including recipient code data; a server communication device; and server control means for parsing said recipient code from each said message, retrieving from said database account configuration data that is associated with said recipient code, and processing each said message according to said account configuration data.

**3**. Digital photo processing system of claim **2**, wherein said server control means processing of said message further comprises archiving said message on said server.

**4**. Digital photo processing system of claim **2**, wherein said server control means processing of said message further comprises distributing said message to one or more recipient addresses associated with said recipient code in said account configuration data.

**5**. Digital photo processing system of claim **2**, wherein said message further comprises an account identifier, said database configuration data includes an account identifier, and said server control means is for retrieving from said database account configuration data that is associated with both said account identifier and said recipient code.

* * * * *

FORM 30. Certificate of Service

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on June 20, 2016
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| David R. Bennett | /s/David R. Bennett |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Direction IP Law |
| Address | P.O. Box 14184 |
| City, State, Zip | Chicago, IL 60614 |
| Telephone Number | 312-291-1667 |
| Fax Number | |
| E-Mail Address | dbennett@directionip.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure Rule 32(a)(7)(B). The brief contains 10,826 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 version 16.0.6925.1016 (32-bit) in 14-point Times New Roman Font.

By: */s/David R. Bennett*
David R. Bennett
*Attorney for Appellant,*
*FO2GO LLC*
June 20, 2016